# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

SHARON JONES,

    Plaintiff,

v.             Civ. No. 12-01301 MV/RHS

HYATT CORPORATION, a Foreign
Corporation, JOHN DOE CORPORATION,
EUGENE MARDELL, PAMELA BEESLEY
and SUZANNE FRAZIER,

    Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants Hyatt Corporation ("Hyatt Tamaya"), Pamela Beesley ("Beesley"), Suzanne Frazier ("Frazier"), and Eugene Mardell's ("Mardell's") Motion for Partial Dismissal ("Motion to Dismiss") [Doc. 22], Defendants' Objections to Plaintiff's Evidence Opposing Defendants' Motion for Summary Judgment ("Objections") [Doc. 60], Defendants Hyatt, Beesley, Frazier, and Mardell's Motion for Summary Judgment ("First Motion for Summary Judgment") [Doc. 41],[1] and Defendants Hyatt Tamaya, Beesley, and Mardell's Motion for Partial Summary Judgment ("Second Motion for Summary Judgment") [Doc. 74]. The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the Motion to Dismiss, Objections, and First Motion for Summary Judgment are well taken in part and therefore are granted in part and the Second Motion

---

[1] The Court entered an Order, filed April 25, 2014 [Doc. 65], granting in part and denying in part both the Motion to Dismiss and the First Motion for Summary Judgment. In the Order, the Court indicated that it would issue a memorandum opinion more fully detailing the rationale for its decision at a later date. [*Id.* at 4 n.2]. This Memorandum Opinion and Order sets forth those reasons.

for Summary Judgment is well taken and granted.

## BACKGROUND[2]

Defendant Hyatt Tamaya operates a resort in Bernalillo County, New Mexico. Hyatt Tamaya offers two full-service restaurants: The Santa Ana Café, a casual restaurant open for all-day dining seven days a week, and The Corn Maiden, a fine-dining restaurant open for dinner Tuesday through Sunday. [Doc. 41 at 5]. Plaintiff Sharon Jones ("Plaintiff") is a 74-year-old former waitress who was employed originally as a server at The Santa Ana Café and later as a server and the designated trainer at The Santa Ana Café. Hyatt Tamaya hired Plaintiff when she was 61 years old and terminated her employment on the day she turned 71 years old.

Plaintiff was one of the higher grossing servers at The Santa Ana Café, [Doc. 52-6 at 3], and was "excellent at selling the higher priced, specialty entrees because of her sales ability and connection to the guests," [Doc. 52-5 at 9, ¶ 5]. Casey Thomas, a former Assistant Restaurant Manager for The Santa Ana Café from June 2008 to May 2010, attests that Plaintiff "always went above and beyond to take care of Hyatt guests," that Thomas received "great feedback regarding [Plaintiff's] service," and that Plaintiff worked well with her shift peers and interacted well with management, [id. at 6 ¶ 4]. Sous Chef Donald Gray attests that Plaintiff was "one of the best servers that [he has] worked with in [his] twenty years of restaurant experience," and that Plaintiff "was regularly assigned a bigger section than the other servers because she was a better server and could handle more tables than the other servers," [id. at 8, ¶ 4; id. at 9, ¶ 6]. Raymond Russo, a fellow server, testified that when he worked at The Santa Ana Café, Plaintiff was, by a large

---

[2]  This section contains only evidence relevant to the pending motions for summary judgment. Except where otherwise noted, the facts contained herein either are undisputed or construed in the light most favorable to Plaintiff. The Court sets forth the allegations relevant to the Motion to Dismiss in the context of its analysis of the merits of that motion.

margin, the most requested server, and that guests would sometimes choose not to eat at the restaurant if Plaintiff was not available to serve them.   [Doc. 52-3 at 58:8-59:1].

In January 2011, Plaintiff received an annual evaluation rating her as "meets standard." [Doc. 52-6 at 7].   The comments by Food and Beverage Manager Pam Beesley read,

> Sharon is a warm and genuine person.   She makes every effort to make sure her guests are taken care of in every way.   She has complete knowledge of the menu and of the service standards and is an informal leader of the team.   Sharon is always positive and support of her team mates (sic) and is always there to lend [an] ear and a kind word or a word of wisdom.   Sharon has many regular customers who request her as their server.   She has an amazing work ethic which never falters.

[*Id.*].   On June, 22, 2012, Beesley and Suzanne Frazier, Hyatt Tamaya's Director of Human Resources, informed Plaintiff that she was meeting expectations as a server.   [Doc. 52-7 at 7].

Hyatt Tamaya has a written policy in its handbook which states that "Hyatt is an equal opportunity and affirmative action employer," that Hyatt does "not discriminate on the basis of . . . age," that Hyatt "strictly prohibits and does not tolerate unlawful harassment," and that "[a]ny form of harassment related to an individual's . . . age . . . will be treated as a disciplinary matter." [Doc. 41-11 at 4; Doc. 41-10 at 12-14].

Hyatt Tamaya also has a written policy in its handbook, referred to as its "open door policy" of communication, which indicates that an employee should feel free to address any problem with his or her supervisor, and that the employee may raise the issue with the local Human Resources Department at the Hyatt Tamaya or may call Hyatt's corporate Human Resources Department in Chicago, Illinois if the employee does not feel comfortable discussing the problem with his or her supervisor.   [*Id.* at 4].   The policy further provides that if the issue has not been resolved to the employee's satisfaction, the employee next may meet with the Hyatt Tamaya's

Human Resources Director and finally with the Hyatt Tamaya's General Manager.   [*Id.*].   Hyatt Tamaya server Russo, however, testified that, in contravention of its open door policy, Hyatt Tamaya discourages employees from addressing problems with the corporate Human Resources Department.   [Doc. 52-3 at 52:13-25].   Specifically, Russo testified it is "just known around the hotel that you don't want to make trouble by contacting corporate, because if you do, then there would be a consequence."   [*Id.* at 52:19-24].

Hyatt Tamaya has an unacceptable behavior policy written in its employee handbook, which provides that "[c]ommon sense and basic values provide a guide as to what is unacceptable behavior in a service business," and which lists examples of unacceptable behavior.   [Doc. 41-12 at 6; Doc. 41-10 at 19].   Examples include "[f]ailure to perform work assignments satisfactorily . . . and/or efficiently," "refus[al] to obey the direct request of a manager," and "failure to follow proper procedures and/or improper check, cash or credit card handling."   [Doc. 41-12 at 6-7; Doc. 41-10 at 19-21].

> Violation of a Hyatt policy or procedure that may be contained in th[e] handbook, or in a house rule that is posted or otherwise communicated in the hotel, or may otherwise exist, may result in disciplinary action.   Depending on the circumstances surrounding the violation, discipline may begin at any of the following steps: [c]ounseling or verbal communications[; w]ritten communications[; f]inal warning, suspension or probation[; s]eparation of employment.

[*Id.* at 21].

Hyatt Tamaya has a cash handing policy, which provides that "[a]ny failure to adhere to the[ cash handling policy] will result in progressive discipline," that the Hyatt Tamaya reserves the right to terminate any employee immediately or to accelerate disciplinary action when the circumstances warrant, including cases of intentional wrongdoing, and that under the policy "all

4

cash variances of $20.00 or more will . . . result in" a verbal warning for a first offense, a written warning for a second offense, a final written warning for a third offense, a suspension for a fourth offense, and termination for a fifth offense.   [Doc. 41-12 at 2].   The policy further provides that any cash variance of $100.00 or more within a 30-day period may result in suspension or termination.   [*Id.*].   Finally, the policy indicates that it applies both to negligent and intentional violations of its terms.   [*Id.* at 3].

In early 2010, Plaintiff approached Human Resources Manager Julie Sebelin to discuss a possible transfer to The Corn Maiden.   [Doc. 41 at 6].   Sebelin informed Plaintiff there were no server positions open at that time.   [*Id.*].   In total, Plaintiff expressed her desire to transfer to The Corn Maiden to no less than five members of Hyatt Tamaya management, including Sebelin, and approached two of these managers on at least two separate occasions.   [Doc. 52-2 at 67:19-23; *id.* at 69:22-70:4].

In August 2010, Hyatt Tamaya posted online a notice of an opening for a part-time server at The Corn Maiden and, in response to the posting, received three applications.   [Doc. 41-7 at 26:20-27:1; Doc. 41-13 at 15-32; Doc. 41-14 at 2-11].   Hyatt Tamaya maintains that it requires all applicants to apply online for open positions, that it posts all of its positions online, and that it does not allow applicants to apply for positions that are not open.   [Doc. 41-7 at 10:8-9; *id.* at 11:18-12:10].   Plaintiff did not apply online for the August 2010 opening at The Corn Maiden. [Doc. 41-7 at 55:15-17; *id.* at 24:13-19].

Plaintiff likewise did not apply for her job at The Santa Ana Café online, but rather applied in person at a job fair.   [Doc. 52-2 at 33:22-25].   Plaintiff testified that in August 2010, James Bass, the applicant ultimately hired for the 2010 Corn Maiden opening, applied for the position in person.   [*Id.* at 73:13-19].   Bass, however, also subsequently applied online for The Corn Maiden

5

position.   [Doc. 41-13 at 15-22].

On April 7, 2011, a regular customer, Dr. Craig Clatanoff, dined at The Santa Ana Café with his wife, and spoke with Kristen Guiliano, a Hyatt Tamaya manager, about the service he received from Plaintiff.   Plaintiff testified that Guiliano informed her that Clatanoff had indicated that Plaintiff's service was "fine" but that he wished Plaintiff had explained the gluten-free options in more detail.   [Doc. 41-1 at 80:8-82:1].   Guiliano issued a written reprimand to Plaintiff, entitled "Employee Discussion Form," in which Guiliano checked the box for a "Verbal Communication," and described the incident involving Clatanoff.   [Doc. 41-12 at 8].   Plaintiff was not aware at the time of the incident, and only learned after she was terminated, that Guiliano had placed a written reprimand in her file.   [*Id.*; Doc. 41-1 at 79:19-80:5].   Plaintiff's signature is not on the reprimand, [Doc. 41-12 at 8], and Plaintiff does not recall receiving a copy of the reprimand, [Doc. 41-1 at 79:19-80:5].   Clatanoff attests that he remembers speaking with management to request that "all" Santa Ana servers learn more about gluten-free options and celiac disease, but that he does "not recall ever complaining about Sharon Jones."   [Doc. 52-5 at 2].   Moreover, Clatanoff asserts that Plaintiff "did a nice job overall" and that "[s]he was friendly, warm and competent."   [*Id.* at 4, ¶ 3].

On June 16, 2011, an incident occurred between Plaintiff and Nate Philippsen, Assistant Food and Beverage Manager.   A memorandum prepared by Director of Human Resources Frazier, on July 6, 2011, explains that the incident arose because Plaintiff "felt [Philippsen] was rude in expressing his frustration with her and other servicers on the P.M. shift on the evening in question."   [Doc. 41-12 at 16].   Frazier reports that Philippsen and others witnessed Plaintiff "becoming emotional on the 'floor' with guests nearby," that Philippsen "tried to console her and in so doing, touched her," that Plaintiff asked Philippsen not to touch her, that Philippsen asked her

6

to move off the floor and speak with him in private, that Plaintiff declined his request that she take a break, and that Plaintiff spoke with him at the end of the evening.   [*Id.*].   When they spoke that evening, Philippsen "explained his frustration with all servers in general in that they were unable to be attentive to guests in a timely manner.   The servers had 2 or 3 tables each and yet new tables were not greeted timely, etc.   He felt they should not have been overloaded and just felt the servers were not being attentive to tasks at hand."   [*Id.*].   Philippsen further expressed that "servers are not meeting expectations in general and [the restaurant's] Maritz scores are reflecting the service levels are not being maintained at an acceptable level."   [*Id.*].

Plaintiff's evidence establishes that on the evening on June 16, 2011, guests seated themselves in her section, and, because the restaurant's hostess had not seated the guests, the hostess had not informed Plaintiff, as was the practice, that the guests were sitting in Plaintiff's section.   [Doc. 52 at 7; Doc. 41-12 at 17].   The hostess reports that Philippsen seated the table without informing the hostess or Plaintiff that he had done so, and that Philippsen then yelled at Plaintiff for failing to greet the party in a timely fashion.   [Doc. 52-6 at 1].   Plaintiff's evidence establishes that when Philippsen confronted Plaintiff about her failure to greet these guests promptly, Philippsen grabbed Plaintiff's arm.   [Doc. 52 at 7].   At the end of the evening, Plaintiff explained to Philippsen, as did another server, that improper staffing was to blame for server performance issues that evening.   [Doc. 41-12 at 16].

On June 17, 2011, Philippsen reported the incident that occurred on June 16, 2011, to Frazier, and Plaintiff reported the matter on June 20, 2011, to Kate Mueller, Employee Relations Director at Hyatt's corporate Human Resources Department in Chicago, Illinois.   [Doc. 41-1 at 100:6-13; 41-3 at 27:10-17].   The facts construed in Plaintiff's favor indicate that Plaintiff reported to Muller that she felt Hyatt Tamaya managers were subjecting her to a hostile work

7

environment, that she felt the hostile work environment was tied to The Corn Maiden, that management was trying to get rid of her to avoid promoting her to The Corn Maiden, [Doc. 41-1 at 100:16-22; *id.* at 101:11-21; *id.* at 107:12-18], and that she was being subjected to age discrimination.   [*Id.* at 107:12-18].   Plaintiff does not recall the specifics of what Muller said in response to Plaintiff's telephone complaint.   [*Id.* at 104:8-13].

After speaking with Plaintiff, Muller contacted Human Resources Director Frazier by telephone and informed Frazier of Plaintiff's concerns.   [Doc. 41 at 12; Doc. 52 at 7].   Frazer, in turn, contacted Plaintiff to organize a meeting among Frazier, Plaintiff, Food and Beverage Manager Beesley, and Director of Food and Beverage Eugene Mardell; Mardell, however, ultimately did not participate in the meeting.   [*Id.*; Doc. 41 at 12].

On June 21, 2011, however, prior to the date of the scheduled meeting, Plaintiff and Mardell spoke on the telephone, and Plaintiff had with Mardell "the same discussion that [she] had with Kate Muller" from corporate, discussing "the work environment, the age discrimination that [she] was feeling, [and] the fact that [she] felt that he . . . was discriminating against [her], keeping [her] from Corn Maiden" "because of [her] age."   [Doc. 41-1 at 107:12-18, 21-24; *see also* Doc. 41-14 at 21].   Frazier's July 6, 2011, memorandum indicates that during this telephone conversation Plaintiff mentioned the 2010 position that opened up in The Corn Maiden, informed Mardell that she had wanted the job, and stated that she had heard Mardell had indicated that Plaintiff was "too old to transfer there."   [Doc. 41-12 at 17].

On June 22, 2011, the meeting among Plaintiff, Frazier, and Beesley transpired.   At the meeting, Plaintiff expressed concern about management style and staffing levels.   [Doc. 41-1 at 123:30-124:3].   The July 6, 2011, memorandum prepared by Frazier indicates that Frazier and Beesley admitted at the meeting that "everybody recognizes [staffing] is an issue."   [Doc. 41-12

8

at 18].   The memorandum also indicates that Frazier and Beesley informed Plaintiff that she was "meeting expectations" as a server in The Santa Ana Café but not "exceeding expectations," because Plaintiff was not utilizing a tray, had not documented a medical reason for her inability to use a tray, was not working fast enough, and was not serving a full section of tables.   [*Id.* at 19-20].   The memorandum further indicates that Frazier and Beesley addressed Plaintiff's concerns about not being hired for a position at The Corn Maiden, that Beesely acknowledged she had "tried to talk Sharon out of going to Corn Maiden" for two years, that Beesley "felt [The Corn Maiden's] environment [of high expectations] would be difficult for Sharon," and that Beesley's opinion "ha[d] never been a reason why Sharon would not be eligible to move to Corn Maiden." [*Id.* at 20].   Frazier and Beesley also informed Plaintiff that the "only" reason she was not interviewed for The Corn Maiden position was that Plaintiff had not applied online.   [*Id.* at 19].

After Food and Beverage Director Mardell's June 21, 2011, telephone conversation with Plaintiff, Mardell spoke with servers and members of the culinary team.   [*Id.* at 12; Doc. 41-14 at 13-14].   A dispute of fact exists with respect to what servers and teams members said to Mardell about Plaintiff.   Defendants identify facts indicating that servers and team members informed Mardell that they liked Jones as a person and that they each indicated that they assisted Plaintiff in her service every day.   [Doc. 41-5 at 53:11-25; Doc. 41-14 at 13-14].   Plaintiff testified that the servers and team members with whom Mardell spoke collectively informed Plaintiff that Mardell would inform Plaintiff that they "threw [Plaintiff] under the bus" when they did not do so.   [Doc. 41-1 at 113:15-25].

From June 27, 2011, to July 5, 2011, Defendants present evidence that Plaintiff received three customer complaints, all of which involved Plaintiff's failure to ring in orders.   The first of these three complaints occurred on June 27, 2011, and is documented by a written Employee

Discussion Form, designated as a "verbal communication," signed by Frazier.  [*Id.* at 12; *id.* at 20-21].  Plaintiff's signature is not on the form and the form indicates that "Employee did not sign."  [*Id.* at 12].  The documentation indicates that a guest complained because Plaintiff forgot to ring in one of the entrees for the guest's table of four persons.  [*Id.*].  When Plaintiff discovered the error, she requested that the cook prepare the entrée "on the fly," and did not bring the matter to the attention of the manager on duty or to the chef.  [*Id.*].  Although the written documentation indicates that Plaintiff attempted to conceal her mistake from management, [*id.*], Plaintiff denies this, [*id.* at 21].  The written reprimand's "Corrective Action" section indicates that Plaintiff should "advise the manager and the Chef when there is any problem with a table whether food or service related so that management can take action to remedy and recover the situation."  [*Id.* at 12].

Plaintiff's evidence suggests that when a server forgets to ring an order, the server customarily informs the kitchen so that the food can begin to be prepared and only thereafter informs a manager.  [Doc. 52-5 at 9, ¶¶ 16-17].  Sous Chef Donald Gray attests that "[w]hen servers would forget to ring in food, it was standard for them to come straight to the kitchen and tell the chef that was on duty what they needed so that the chef could get it out as soon as possible," and that "[e]ither the chef on duty or the responsible server would then tell the manager on duty, who would decide whether to offer the guest a discount."  [*Id.* at 9, ¶ 17].  Plaintiff further presents evidence that it is not unusual for servers to forget to order items, [Doc. 52-3 at 24:18-25; Doc. 52-2 at 121:11-13], and that management did not typically write up servers for failing to ring an order, [Doc. 52-5 at 9, ¶ 16; Doc. 52-3 at 24:12-25].  Gray, who worked in the capacity of Sous Chef for The Santa Ana Café from June 19, 2007 to November 25, 2010, attests that he "never saw a server get disciplined for forgetting ring in an entrée on time or making mistakes when ringing

10

in . . . orders."   [Doc. 52-5 at 9, ¶ 16; Doc. 74-5, ¶ 4].   One similarly situated server who worked at The Santa Ana Café, James Russo, attested that he "periodically" forgot to ring in an order but that he has never been written up for these mistakes.   [Doc. 52-3 at 24:12-25].

On June 28, 2011, Frazier met with Plaintiff to discuss the June 27, 2011, incident.   [Doc. 41-12 at 20].   At the end of the meeting, Frazier's June 25, 2011, memorandum indicates that Frazier informed Plaintiff that Hyatt Tamaya would be placing a full documentation of events, beginning June 16, 2011, through the present, in Plaintiff's file, and that Plaintiff had the right to meet with General Manager Colleen Kareti as the next step in Hyatt Tamaya's open door policy. [*Id.* at 21].   Frazer's memorandum also reports that Plaintiff expressed a desire to meet with Kareti.[3]   [*Id.*].

On July 1, 2011, Plaintiff received the second of the three complaints.   The documentation of the complaint indicates that Plaintiff failed to ring in three entrees ordered by a fourteen-person table, and that, after discovering the mistake, Plaintiff rang in the orders over 30 minutes after she entered in the original entrées.   [*Id.*; Doc. 41-14 at 16].   Plaintiff also failed to inform a manager of her error.   [Doc. 41-12 at 21; Doc. 41-14 at 16].   Beesley sent an e-mail to Frazier, Mardell, and Giuliano, on July 2, 2011, indicating that Plaintiff informed the adult guest missing his order that the kitchen had overcooked the entrée and that Plaintiff had sent it back to be remade when Plaintiff, in fact, had not rung in the order.   [*Id.*].

Plaintiff's evidence indicates that the evening of July 1, 2011, was challenging because the restaurant was busy, she had been seated with tables both inside and outside, and she had been

---

[3]   In her response to the First Motion for Summary Judgment, Plaintiff denies that Frazier informed Plaintiff that she could meet with Kareti, but cites no evidence in support of this assertion.   Because Plaintiff cites to no evidence, the Court declines to consider Plaintiff's unsupported statement.

given a fourteen-person table in a third area—the private dining room—of the restaurant.   [Doc. 52-2 at 125:21-23].   The server that Plaintiff was training even questioned why management would assign Plaintiff tables in so many different areas of the restaurant.   [*Id.* at 126:4-7].

An e-mail from Frazier to Mueller indicates that Hyatt Tamaya issued a written warning to Plaintiff regarding the July 1, 2011, incident.   [Doc. 41-14 at 19].   The e-mail also indicates that the hotel has "not had these kinds of issues with Sharon in the past" and that "[i]t seems this year has been a challenge."   [*Id.* at 20].   An e-mail from Mardell forwarding Beesley's e-mail describing the July 1, 2011, incident to General Manager Kareti states that he "really feel[s] Plaintiff] has lost the ability to accomplish her job with us," and acknowledges that "[Plaintiff] of course is going to say we are being unfair and riding her but she is missing the basic fundamentals and in all fairness she brought this added scrutiny on herself."   [*Id.* at 16].

On July 3, 2011, Defendants removed Plaintiff as The Santa Ana Café's designated trainer, articulating the justification for the decision as Plaintiff's failure to comply with service expectations.   [*Id.* at 19].   An e-mail from Frazier to Mueller on July 5, 2011, explains that Hyatt Tamaya's guidelines provide that performance must be "of the highest standards," and that Plaintiff cannot continue as a designated trainer "given recent events."   [*Id.* at 19].   Frazier's August 5, 2011, memorandum likewise indicates that Defendants demoted Plaintiff because "[h]er relationships with management are not positive and her performance is not at the exceptional level required of Designated Trainers."   [Doc. 41-12 at 24].   Plaintiff lost $1.00 per hour, effective July 3, 2011, due to the removal of these duties.   [Doc. 52-10 at 1].

On July 5, 2011, Plaintiff received a third guest complaint.   A guest seated at a two-person table complained that she and her companion did not receive a salad they had ordered prior to their receipt of their entrées.   [Doc. 41-14 at 25].   Philippsen sent an e-mail on July 5, 2011, to Kareti,

Mardell, and Frazier, explaining that the guest stated that it "[s]eemed like [Plaintiff] was hard of hearing because of her age and couldn't understand them."   [*Id.* at 24].   The evidence indicates that Plaintiff rang in the two entrees for the table at 7:40 p.m., and then rang in the salad at 7:56 p.m., after the table complained that the salad was missing.   [*Id.* at 25].   Plaintiff did not notify Philippsen, the manger on duty, of the mistake, and it was only after the guest complained to Philippsen that he became aware of the issue.   [*Id.*].   Other service staff also made mistakes on the evening of July 5, 2011.   [Doc. 41-12 at 24].

On July 6, 2011, Plaintiff attended the meeting with Kareti that Frazier maintains Plaintiff requested, at which Frazier also was present.   [Doc. 41-12 at 23].   Kareti informed Plaintiff that ordinarily after a third guest complaint, Hyatt Tamaya would deliver a final warning or termination, but explained that, because the events of the past three weeks had affected Plaintiff's ability to do her job effectively, Kareti would not document the third and latest service incident from July 5, 2011.   [*Id.*].   At the July 6, 2011, meeting, Kareti also informed Plaintiff that the series of events over the past three weeks had "her department managers on edge, as they are trying to be fair and consistent but are walking on egg shells as a result of [Plaintiff] escalating her issues to the general manager, human resources and corporate office."   [*Id.* at 24].

In a July 6, 2011, e-mail, Mueller from corporate headquarters, to whom Plaintiff originally had reported she felt discriminated against because of her age, advised Frazier that "it does seem that continued or further documentation could/would be construed as retaliation." [Doc. 52-10 at 6].

On July 21, 2011, Kareti received a report that Plaintiff had requested a signed copy of a floor chart from Philippsen.   [Doc. 41-12 at 24].   Plaintiff informed Kareti that managers were conspiring against and were out to get Plaintiff.   [*Id.*].   Specifically, Plaintiff complained that

13

management was limiting her tables and not seating her with large parties, which in turn decreased Plaintiff's tips, and that Plaintiff believed management was taking these actions in reprisal for her complaint to the corporate Human Resources Department.   [*Id.*].   Upon investigation, Kareti found that Plaintiff's complaint regarding management's restriction of her tables was accurate, and Kareti instructed management not to limit the number or size of Plaintiff's tables.   [*Id.*].

On July 25, 2011, Assistant Food and Beverage Manager Kevin Kruger received a complaint from a guest about Plaintiff's failure to bring a sufficient amount of bread to a fourteen-person table, about Plaintiff's slow service, and about her inattentiveness.   [*Id.* at 25; Doc. 41-14 at 27].   After the complaint, Kruger began to pay close attention to Plaintiff's performance and documented Plaintiff's performance issues using a paper pad and pen he carried with him while observing Plaintiff.   [Doc. 41-12 at 25].   Kruger's e-mail summarizing Plaintiff's performance issues that evening indicates that he informed Plaintiff the guests wanted to order their children's meals first and asked her to take these orders, but that after five to ten minutes had passed Plaintiff had not obtained the orders.   [Doc. 41-14 at 27; Doc. 41-12 at 25].   In addition, Plaintiff failed to order soups and/or to deliver the soups in a timely fashion, and Plaintiff had to request that the chefs prepare the soups "on the fly" because they either had not been received or had been received cold.   [Doc. 41-14 at 27; Doc. 41-12 at 25].   At the conclusion of the meal, guests informed Kruger that Plaintiff's service was slow, that a six-person table arriving 45 minutes after the fourteen-person table received their meals no more than ten minutes after the fourteen-person table received their food, and that Plaintiff was "unorganized."   [*Id.*].

Plaintiff telephoned Kareti on July 27, 2011, to discuss the events that occurred on the evening on July 25, 2011.   [*Id.*].   According to Frazier's August 5, 2011, memorandum, Plaintiff complained that Kruger had been following her around with a notepad to document Plaintiff's

service and that he was "out to get her." [*Id.*]. Plaintiff further complained that she was feeling as if management was retaliating against her by reporting poor performance when her sales were the highest. [*Id.* at 26]. Kareti informed Plaintiff that Plaintiff could not continue to receive guest complaints and reminded Plaintiff that Plaintiff again had failed to notify the manager on duty about her service issues. [*Id.*]. Kareti informed Plaintiff, however, that Kareti would give Plaintiff the "benefit of the doubt" and for a second time would not discipline Plaintiff for the events of July 25, 2011. [*Id.*].

On July 29, 2011, a Maritz survey completed by a guest at one of Plaintiff's tables indicated that the guest's "waitress was really clueless," spilled water on the table, and disappeared for 20 minutes. [*Id.*]. Plaintiff points out that Defendants have failed to attach a copy of this survey to their summary judgment materials and that they have denied in papers filed before this Court that any written complaint exists.

On July 30, 2011, Plaintiff unintentionally violated Hyatt Tamaya's cash handling policy. [*Id.*; Doc. 52-1 at 57:23-25]. Plaintiff charged $112.36 on the credit card of a guest, Debra Kane, when the guest had authorized only $50.02 in charges, paid the remaining $62.34 in cash, and left Plaintiff a tip of approximately $20.00 in cash. [Doc. 41-12 at 27]. Frazier's memorandum dated August 5, 2011, asserts that Hyatt Tamaya learned of the unintentional violation on August 1, 2011, when the guest Kane called the hotel to correct the overcharge to her credit card. [*Id.* at 26]. Frazier's memorandum further indicates that Hyatt Tamaya would not have known of the overcharge if Kane had not discovered it and reported it to management. [*Id.* at 27]. On August 3, 2011, the hotel suspended Plaintiff with pay pending investigation of the complaint Fraizer maintains that Kane lodged. [*Id.*].

Kane's declaration describing the events on the evening of June 3, 2011, contradict several

15

facts reported by Frazier in her August 5, 2011, memorandum.   Kane reports that on the evening of July 30, 2011, the restaurant was busy and seemed short-staffed, and that Kane's husband was impressed with Plaintiff's energy.   [Doc. 52-5 at 2].   Kane further attests that each person at her table offered either a credit card or cash to pay separate amounts for what the person ordered, and that payment of the bill was confusing because of this combination.   [*Id.*].   Several days later, Kane asserts that—contrary to Frazier's representation in her memorandum—management from the hotel called Kane regarding the overcharge.   [*Id.*].   Kane did not contact the hotel.   [*Id.*]. Kane attests that she "thought [the Hyatt representative who called her was] making a bigger deal about the mistake than the situation required."   [*Id.* at 3].   Kane also asserts that "[f]or many years, each time [she] went to The Santa Ana Café, [she] would request to be seated in Sharon's section," that Kane requested Plaintiff's service on July 30, 2011, that "[she and her guests] always had great service and had developed a very nice, warm relationship with Sharon," and that Kane "found [Sharon] to be an asset to the Hyatt and would say so on all the comment cards [she] would submit."   [*Id.* at 2-3].

On August 5, 2011, Plaintiff met with Frazier and Beesley.   [Doc. 41-12 at 27].   Frazier's August 5, 2011, memorandum indicates that as of July 28, 2011, Plaintiff had received four complaints regarding her service over six weeks, [*id.*], and that since July 28, 2011, Plaintiff had a poor Maritz score on July 29, 2011, and she violated the cash handling policy on July 30, 2011. [*Id.*].   Frazier further notes that at two points, Hyatt Tamaya could have issued a final warning, but that Hyatt Tamaya management opted to provide Plaintiff with "the benefit of the doubt" and to coach its managers on how effectively to supervise Plaintiff.   [*Id.*].   After providing Plaintiff with an opportunity to respond to the July 29, 2011, complaint, and the July 30, 2011, violation, Hyatt Tamaya terminated Plaintiff's employment, effective August 5, 2011, citing Plaintiff's

16

violation of the hotel's cash handling policy and her performance issues in contravention of the hotel's unacceptable behavior policy as reasons for the termination.   [*Id.*].

Plaintiff presents evidence suggesting that Defendants singled her out for complaint. Specifically, Plaintiff points to the declaration of Sous Chef Gray, who worked with Plaintiff for almost three and one-half years, in which Gray attests that "Mardell and Beesley asked me more than once how I felt about Sharon and her performance," that "[w]hen Mardell and Beesley asked [him] about Sharon, [he] felt that they were singling her out because they did not ask [him] about other servers' performance in the same way," and that "[w]hen the restaurant was busy and all of the servers were getting behind, Mardell and Beesley would single out Sharon for criticism. [Doc. 52-5 at 9, ¶¶ 13, 14, 15].   Likewise, Plaintiff points to the declaration of former manager Casey Thomas, in which she attests that "[t]here were many times over the 2 years that [she] worked [at The Santa Ana Café] that [management] would have [her] try to catch people doing the littlest things in order to dispose of them on purpose, yet they would let many other things slide for employees that they 'valued' or played favorites for."   [*Id.* at 7, ¶ 10].

In addition, Plaintiff presents evidence that management disciplined her more harshly than the recommendations in the cash handling policy and more harshly than other employees with cash handling violations involving greater dollar amounts.   For example, Hyatt Tamaya management gave a written warning and a three-day suspension, and not termination, to a significantly younger female server with a cash discrepancy of $207.72.   [Doc. 52-10 at 3].   Likewise, Hyatt Tamaya management gave a five-day suspension without pay to a younger male manager for a $700 discrepancy.   [*Id.* at 4-5].   Hyatt Tamaya ultimately terminated the male manager citing his violation of the cash management policy and unacceptable behavior policy, as well as his failure to meet performance expectations, as reasons for the termination.   [*Id.*].

Plaintiff also points to evidence that Defendants made derogatory jokes about her age, indicated they did not like her because of her age, opined that she was mentally compromised because of her age, and referenced her age as a reason for not hiring her as a server at The Corn Maiden.  For example, Gray attests that he heard Mardell and Beesley "[o]n a handful of occasions" "making jokes about Sharon's age," that Mardell and Beesley also said things to him while he was in the kitchen such as "'Sharon is senile' and 'Sharon is getting up in age' and 'Sharon is getting too old,'" that he heard Mardell joke with Frazier about Plaintiff's age, and that he heard Mardell call Plaintiff "senile" to Frazier as well as make other derogatory comments about Plaintiff's age.  [Doc. 52-5 at 9, ¶¶ 9, 10, 11, 12, 13].

Likewise, Thomas attests that while she was working as an assistant manager, which was from June 2008 to May 2010, [*id.* ¶ 3], Mardell said "many times that he disliked Sharon due to her age," that Mardell would "also frequently tell [Thomas] to watch [Plaintiff] because she was an 'old-timer' and 'senile' and could possibly be stealing from the Hyatt by not charging guests for Brunch buffets because they paid cash," that Mardell made it "very clear to [Thomas] in sly comments that [Mardell] disliked [Plaintiff] and thought she was an 'old bat,'" that she observed Hyatt Tamaya management treat older people as if they were "expendable," and that management did not believe that older people were the "right image" for its restaurants.  [*Id.* at 7, ¶¶ 5, 6, 7, 8, 9].  Thomas concedes that she does not recollect when Mardell made these comments and she does not specify the precise language Mardell used.  [*Id.*].

Moreover, Plaintiff presents evidence that Beesley said to Thomas "in exact quotes that 'Sharon Jones would not be a good fit in the Corn Maiden due to her age,'" that Beesley made this comment during the time that Plaintiff was interested in transferring to The Corn Maiden, that Beesley mentioned that it would be too difficult to mold Plaintiff into the type of server they were

18

seeking due to Plaintiff's age, and that Plaintiff would be too slow and old-fashioned to be appealing as a server in The Corn Maiden.   [*Id.* at 7].   Moreover, Raymond Russo testified that Beesley told him higher management would not promote Plaintiff because of her age, [Doc. 52-3 at 28:1-7], and Plaintiff testified that she assumed Mardell made the comment to Beesley because he was the "higher" manager.   [Doc. 52-2 at 108:15-109; *id.* at 109:25-110:8].

Plaintiff's evidence indicates that Defendants hired Lea Garcia, 24 years old, as a Santa Ana server on June 27, 2011, and that they hired Joleen Chaverz, 32 years old, on August 22, 2011, approximately two weeks after Plaintiff's termination.   [Doc. 52-11 at 2].

## **STANDARD**

I.   Motion to Dismiss.

A.   Federal Rule of Civil Procedure 12(b)(1).

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter."  Fed. R. Civ. P. 12(b)(1).   "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction."   *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).

Whenever it appears that a district court lacks jurisdiction over the subject matter involved in an action, the court must dismiss the action.  *See Tuck v. United Servs. Auto. Ass'n*, 859 F.2d 842, 844 (10th Cir. 1988) (citation omitted), *cert. denied*, 489 U.S. 1080 (1989).   "The party seeking the exercise of jurisdiction in his favor must allege in his pleading the facts essential to show jurisdiction."  *U.S. ex rel. Gen. Rock & Sand Corp. v. Chuska Dev. Corp.*, 55 F.3d 1491, 1495 (10th Cir. 1995).   In determining whether a party has adequately presented facts sufficient to establish jurisdiction, the court should look to the complaint's face, *see Whitelock v. Leatherman*, 460 F.2d 507, 514 (10th Cir. 1972), accepting the well-pleaded factual allegations as true, *see United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001), but ignoring

conclusory allegations of jurisdiction, *see Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971). On a jurisdictional motion, a court may also look at documents and evidence not contained in the pleadings. *See Davis ex rel. Davis v. U.S.*, 343 F.3d 1282, 1296 (10th Cir. 2003), *cert. denied*, 542 U.S. 937 (2004).

      B.    <u>Federal Rule of Civil Procedure 12(b)(6).</u>

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir. 1994). A complaint's sufficiency is a question of law, and on a 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted), *cert. denied*, 558 U.S. 1148 (2010).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint must contain sufficient facts which, if assumed to be true, state a claim to relief that is plausible on its face. *See Twombly*, 550 U.S. at 570; *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted). The Tenth Circuit has explained,

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

*Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).

II.     Motion for Summary Judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). Under Rule 56(c), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir.

1993) (citations omitted).   The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case."   *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).   Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."   *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).   If the responding party fails to properly address the movant's assertion of fact as required by Rule 56(c), a district court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).   Upon a motion for summary judgment, a district court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence."   *Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).

## DISCUSSION

I.      Motion to Dismiss [Doc. 22].

Defendants move to dismiss several claims in the First Amended Complaint.   First, Defendants ask the Court to dismiss Plaintiff's Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and New Mexico Human Rights Act ("NMHRA"), 28 N.M.

Stat. Ann. §§ 28-1-1 *et seq.*, sex discrimination claims pursuant to Federal Rule of Civil Procedure 12(b)(1) on the ground that Plaintiff failed to exhaust her administrative remedies.   Next, Defendants request that the Court dismiss Plaintiff's Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and NMHRA age-based discrimination and retaliation claims premised upon a failure to promote, and Plaintiff's ADEA and NMHRA discrimination and retaliation claims arising out of employment actions occurring prior to July 21, 2011, pursuant to Rules 12(b)(1) and 12(b)(6), on the ground that Plaintiff failed to file a timely administrative claim within 300 days of the events giving rise to the claim.   In addition, Defendants move for dismissal of Plaintiff's defamation claims pursuant to Rule 12(b)(6) on the ground that Plaintiff has failed to allege plausible facts supporting the claims.   Finally, Defendants ask the Court to dismiss Plaintiff's breach of contract claims pursuant to Rule 12(b)(6) on the ground that Plaintiff has failed to allege plausible facts establishing the existence of an employment contract.

A.      The Court Denies as Moot Defendants' Motion to Dismiss a Sex-Based Discrimination Claim.

Defendants move for dismissal of Plaintiff's Title VII and NMHRA sex-based discrimination claims pursuant to Rule 12(b)(1) on the ground that Plaintiff failed to file an administrative claim prior to bringing suit.   [Doc. 22 at 2].   Defendants contend that Plaintiff's administrative charge of discrimination was limited to the protected category of age.   Plaintiff has indicated in her opposition to the Motion to Dismiss that she is not bringing a discrimination claim based upon the protected category of sex.   [Doc. 26 at 2].   Thus, the Court denies the Motion to Dismiss as moot to the extent it seeks dismissal of any sex-based discrimination claims.

B.      The Court Denies as Moot Defendants' Motion to Dismiss a Discrimination Claims Based Upon Defendants' Failure to Promote Plaintiff.

Defendants move for dismissal of Plaintiff's ADEA and NMHRA claims to the extent

23

Plaintiff brings those claims premised upon Defendants' failure to promote Plaintiff.   Plaintiff has indicated that she is not bringing any statutory claims arising out of Defendants' failure to promote her.   [Doc. 40 at 10].   Thus, the Court denies the Motion to Dismiss as moot to the extent it seeks dismissal of any failure to promote claims.

C.     The Court Grants Defendants' Motion to Dismiss Plaintiff's ADEA and NMHRA Claims Premised on Adverse Employment Actions Occurring Prior to July 21, 2011.

Defendants move for dismissal pursuant to Rules 12(b)(1) and 12(b)(6) of Plaintiff's ADEA and NMHRA claims premised on adverse employment actions occurring prior to July 21, 2011.   [Doc. 22 at 3].   Defendants argue that these claims are time barred, because Plaintiff filed her administrative charge of discrimination with the Equal Employment Opportunity Commission and the New Mexico Human Rights Division on May 16, 2012, and the employment actions forming the basis of these claims occurred more than 300 days prior to May 16, 2012.

The Supreme Court and Tenth Circuit have held that a plaintiff must timely file an administrative charge for each act for which the plaintiff seeks a remedy.   *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," and "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice."); *Martinez v. Potter*, 347 F.3d 1208 (10th Cir. 2003) ("[E]ach discrete incident of [employer] treatment constitutes its own unlawful employment practice for which administrative remedies must be exhausted.").   Plaintiff failed to file an administrative charge encompassing acts occurring prior to July 21, 2011, within 300 days of those acts.   Thus, to the extent Plaintiff alleges ADEA and NMHRA claims premised upon acts occurring before this

24

date, the Court grants the Motion to Dismiss.[4]   The Court notes, however, that, although it dismisses claims premised upon actions occurring prior to July 21, 2011, as untimely, evidence of these actions may be admissible to support Plaintiff's timely-filed ADEA and NMHRA claims.

      D.       The Court Denies as Moot Defendants' Motion to Dismiss Plaintiff's Defamation Claims.

Defendants move for dismissal pursuant to Rule 12(b)(6) of Plaintiff's defamation claims on the ground that Plaintiff fails to identify the alleged defamatory statements with sufficient precision, to specify who made the statements, and to indicate the reason the statements are defamatory.   [Doc. 22 at 4].   In support of this assertion, Defendants cite *Kennedy v. Enterprise Leasing Co*., No. 98-CV-0718, 1998 WL 1674699 (D.N.M. Oct. 30, 1998), in which this Court held that a count alleging that "Defendants defamed Plaintiff by 'disseminating . . . information to others regarding the investigation and the termination of Kennedy,'" "[a]bsent a specific factual foundation which would support the inference of defamation," did not state a claim for relief.   *Id.* at *5-6.   The Court need not decide whether Plaintiff's defamation claims against Defendants withstand Rule 12(b)(6) scrutiny, however, because the Court instead grants summary judgment on Plaintiff's defamation claims pled in the First Amended Complaint.   Thus, Defendants' Motion to Dismiss those claims pursuant to Rule 12(b)(6) is moot and the Court therefore denies the Motion to Dismiss these claims as moot.

      E.       The Court Grants Defendants' Motion to Dismiss Plaintiff's Breach of Contract Claim.

---

[4]   The Court is not persuaded to hold otherwise by Plaintiff's argument that "it is premature to consider whether any acts of discrimination that may have allegedly fallen outside the 300-day limitation period might nevertheless be actionable in this case through [estoppel], waiver or equitable tolling."   [Doc. 26 at 12].   Plaintiff has failed to identify any allegations which support application of these doctrines or to explain why the doctrines apply.   In the absence of such a showing, Plaintiff cannot satisfy her Rule 12(b)(6) pleading obligations.

The First Amended Complaint alleges that "Plaintiff had a valid employment contract with the Defendants," [Doc. 21 ¶ 70], that "[t]he contract between the Plaintiff and the Defendants prohibited discriminatory conduct by the Defendants," [*id.* ¶ 71], that "Defendants' conduct willfully, recklessly and maliciously breached the employment contract by engaging in conduct that included discrimination based on sex and age," [*id.* ¶ 72], that "Defendants also breached the contract's implied covenants of good faith and fair dealing," [*id.* ¶ 73], and that "[a]s a direct and proximate result of Defendants' breach of Plaintiff's employment contract, Plaintiff has suffered damages," [*id.* ¶ 74].   Defendants contend that the Court should dismiss Plaintiff's breach of contract claims pursuant to Rule 12(b)(6) because the First Amended Complaint fails to identify the contract, the parties to the alleged contract, or any specific breach of the alleged contract. [Doc. 22 at 3].   Defendants further maintain that Plaintiff cannot state a claim for relief because the contract, to the extent it is based upon Hyatt Tamaya's anti-discrimination policy, is not supported by consideration.   [*Id.*].   The Court agrees with Defendants and holds that Plaintiff's allegations are not sufficient to state a plausible claim for relief.

To prove the formation of a valid New Mexico contract, the party seeking enforcement generally must show that the contract is "factually supported by an offer, an acceptance, consideration, and mutual assent."   *Garcia v. Middle Rio Grande Conservancy Dist.*, 918 P.2d 7, 29 (N.M. 1996).   Employment contracts in particular are subject to additional requirements.   In New Mexico, an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise."   *Hartbarger v. Frank Paxton Co.*, 857 P.2d 776, 779 (N.M. 1993) (citation omitted), *cert. denied*, 510 U.S. 1118 (1994).   New Mexico courts, however, "have recognized [an] exception[] to the general rule of

at-will employment:   [namely,]   . . . an implied contract term that restricts the employer's power to discharge."   *Id*.   A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the parties' conduct, or in a combination of representations and conduct.   *See Newberry v. Allied Stores, Inc*., 773 P.2d 1231, 1233 (N.M. 1989) (citation omitted).   "[A] personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined."   *Id.* at 1234.   Because "an agreement to do what one is already legally bound to do is not sufficient consideration for the promise of another," *W. Bank of Santa Fe v. Biava*, 787 P.2d 830. 831 (N.M. 1990), however, an anti-discrimination policy cannot form the basis of an enforceable employment contract, *see Clayton v. Vanguard Car Rental U.S.A., Inc*., 761 F. Supp. 2d 1210, 1280 (D.N.M. 2010).

"An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon."   *Hartbarger*, 857 P.2d at 783.   If the alleged employer's promise is not sufficiently explicit, the courts will not imply a contract.   *See id.* at 780.

The Court holds that Plaintiff's allegations do not state a claim for relief because Plaintiff has not pled facts sufficient to establish an enforceable employment contract.   First, Plaintiff's facts do not identify any specific contract and do not plead, even in conclusory fashion, the necessary elements of an offer, acceptance, consideration, and mutual assent.   *Cf. Garcia*, 918 P.2d at 29.   Rather, Plaintiff alleges only that she "had a valid employment contract with the Defendants," [Doc. 21 ¶ 70], and that "[t]he contract between the Plaintiff and the Defendants prohibited discriminatory conduct by the Defendants," [*id.* ¶ 71].   This allegation is not sufficient to establish an enforceable employment contract.   *Cf. Armijo v. N.M. Dep't of Transp.*, No.

27

08-0336, 2009 WL 1329192, *7 (D.N.M. Apr. 6, 2009) (holding allegations that "the Department would follow state employment policies and procedure, and that the Department terminated him in breach of those policies without just cause," were insufficient to state a breach of an implied contract claim, because the plaintiff did not "indicate what contractual provisions or employment policies the Department breached" and did not say "to what his employment contract entitles him or of what the Department deprived him"); *Back v. ConocoPhillips Co.*, No. 12-CV-0261, 2012 WL 6846397 (D.N.M. Aug. 31, 2012) (holding that the plaintiff failed to state a claim for breach of an employment contract, because the plaintiff "fails to allege who or what represented to [him] that he could expect certain policies and procedures to govern the length of his employment" or "the procedures he alleges he was promised and of what he had a reasonable expectation").

Likewise, to the extent Plaintiff relies upon the Court implying a contract to support her breach of contract claim, the Court holds that Plaintiff's allegations do not contain the necessary "explicit" facts to establish that Defendants created a reasonable expectation in Plaintiff of an enforceable contract.   Under New Mexico law, the "reasonableness of expectations" necessary to plead an implied contract "is measured by just how definite, specific, or explicit" the employer's representations were to the plaintiff.  *See Hartbarger*, 857 P.2d at 783.  The allegations that Plaintiff "had a valid employment contract" which "prohibited discriminatory conduct," unsupported by any other facts, are not sufficiently explicit to establish that Defendants created a reasonable expectation in Plaintiff of a contractual agreement.   Moreover, to the extent Plaintiff contends that Hyatt Tamaya's anti-discrimination policy constitutes an implied contract, the Court concludes that Plaintiff has not pled facts demonstrating that a contract, even if implied from this policy, was supported by adequate consideration.   "[A]n agreement to do what one is already legally bound to do is not sufficient consideration for the promise of another."   *W. Bank of Santa*

*Fe v. Biava*, 787 P.2d 830. 831 (N.M. 1990).   For this reason, Hyatt Tamaya's anti-discrimination policy cannot form the basis of an enforceable employment contract.   *Cf. Clayton*, 761 F. Supp. 2d at 1280; *see also Salazar v. City of Albuquerque*, 776 F. Supp. 2d 1217, 1251 (D.N.M. 2011) (holding that a city charter did not create an implied contract with a city employee "[b]ecause the Mayor is already bound to obey whatever strictures the City Charter imposes upon him or her" and the contract therefore is not supported by adequate consideration); *Armijo*, 2009 WL 1329192, at *7 (explaining allegations that "the Department would follow state employment policies and procedure, and that the Department terminated him in breach of those policies without just cause," were insufficient to state a breach of an implied contract claim).[5]

For the foregoing reasons, the Court concludes that the First Amended Complaint does not allege plausible facts establishing the formation of a valid employment contract.   Accordingly, the Court grants Defendants' Motion to Dismiss Plaintiff's breach of contract claims against them.

II.     Defendants' Objections to Plaintiff's Evidence Opposing Summary Judgment [Doc. 60].

Defendants object to the declarations of Debra Kane, Craig Clatanoff, Casey Thomas, and Donald Gray, [Doc. 52-5 at 1-10], which Plaintiff attaches to her opposition to the First Motion for Summary Judgment, [Doc. 60], as well as to other evidence Plaintiff relies upon to defeat their motion.   The Court first addresses Defendants' objections to the declarations and next addresses Defendants' remaining objections to Plaintiff's evidence.

---

[5]     *See also, e.g.*, *Mutual v. Tex. Roadhouse Mgmt. Corp.*, 753 F. Supp. 2d 954, 968-69 (D.S.D. Nov. 10, 2010) (holding that a breach-of-contract claim seeking to enforce the anti-discrimination provisions in the employer's employee handbook fails because the employer already must abide by Title VII and a promise to perform a legal duty is not consideration for a return promise); *Byra-Grzegorczyk v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 254 (D. Conn. 2008) (recognizing that an "anti-discrimination policy" does not indicate that an employer is undertaking any contractual obligations towards the employee; rather, it requires the employer "to comply with federal and state anti-discrimination laws").

A.    Defendants' Objections to the Declarations.

Defendants ask the Court to strike the Kane, Clatanoff, Thomas, and Gray declarations in full, or, in the alternative, to strike specific portions of the declarations, for failure to comply with the Federal Rules of Evidence.   Defendants first object to all four of the declarations on the ground that the declarants attest that the facts asserted are based at least in part on "information and belief."   [Doc. 60 at 1].   Defendants maintain that the declarations are inadmissible because the Federal Rules of Evidence require that lay witnesses premise their testimony on actual "personal knowledge" and not on hearsay or "information and belief."   [*Id.* (citing Fed. R. Evid. 602)].   Defendants maintain that because "[n]one of the declarations distinguish which alleged 'facts' are based on personal knowledge and which are upon 'information or belief,' . . . the Court cannot justifiably rely on any facts set forth in these declarations, as they are vague as to the origin of their alleged 'facts,'" and "the witnesses are not competent under Rule 602 because they are not testifying from their personal knowledge."   [*Id.* at 1-2].   Thus, Defendants argue that the Court must strike all four declarations in their entirety.   [*Id.*].

Federal Rule of Evidence 602 provides in relevant part, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."   Fed. R. Evid. 602.   While admittedly, the declarants all assert that their "statements . . . are based on . . . personal knowledge or based on information and belief," [Doc. 52-5 at 1, ¶ 1; *id.* at 4, ¶ 1; *id.* at 6, ¶ 1; *id.* at 8, ¶ 1], the declarants thereafter immediately state that the "facts set forth are true to the best of [their] knowledge and recollection," and "[i]f called, [they] could and would testify to these facts in a court of law," [*id.*; *id.* at 1, ¶ 1; *id.* at 4, ¶ 1; *id.* at 6, ¶ 1].   More importantly, at the end of the declarations, the declarants specifically declare "under penalty of perjury that the foregoing is true and correct based on [their] personal knowledge

and experience," and the declarants immediately thereafter sign their names to affirm that they understand their oath in full.   [*Id.* at 1, ¶ 1; *id.* at 4, ¶ 1; *id.* at 6, ¶ 1; *id.* at 8, ¶ 1].   The Court concludes that these assertions are sufficient to establish that the declarations are based upon the declarants' personal knowledge, and the Court therefore overrules Defendants' objection.

In the event that the Court declines to strike the declarations in full, Defendants ask the Court to strike specific portions of the declarations.   Defendants first object to paragraphs six, fourteen, seventeen, and eighteen of Kane's declaration.   Defendants maintain that the Court should strike paragraph six because "it is vague, irrelevant, [and] purport[s] to offer facts that are clearly not within the witness' personal knowledge, are hearsay and constitute impermissible opinion testimony."   [*Id.* at 2 (citing Fed. R. Evid. 401, 403, 602, 701 and 802)].   Paragraph six provides, "I recall that the Santa Ana Café was busy that evening.   I recall my husband mentioned that [Plaintiff's] tables seemed to be scattered all over the dining room and was impressed by her energy running all over the dining room."   [Doc. 52-5 at 2, ¶ 6].   Defendants contend that Kane's statement that her husband "mentioned" that "[Plaintiff's] tables seemed to be scattered all over the dining room" is hearsay.   [Doc. 60 at 2 (citing Fed. R. Evid. 802)].

Hearsay is defined as "a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."   Fed. R. Evid. 801(c).   A "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."   Fed. R. Civ. P. Rule 801(a).   Plaintiff offers Kane's husband's assertion that her tables were scattered throughout the room to prove that her tables were, in fact, scattered throughout the room.   Thus, the Court concludes that the statement constitutes hearsay.   Debra Kane's assertion, however, that her husband was "impressed" by Plaintiff's energy is not an "assertion" by Mr. Kane and therefore is not a "statement" that falls within the hearsay definition.   *See id.*   Rule 801(a), (c).   Because

31

Plaintiff has failed to establish that an exception to the hearsay rule applies, the Court strikes the portion of the declaration which reads, "mentioned that Sharon's tables seemed to be scattered all over the dining room and," but leaves the remainder of paragraph six intact so that it provides, "I recall that the Santa Ana Café was busy that evening.   I recall my husband was impressed by [Sharon's] energy running all over the dining room to serve her customers."

Defendants also object to paragraph six on the ground that impressions about Plaintiff's energy constitute inadmissible opinion testimony.   [Doc. 60 at 2 (citing Fed. R. Evid. 602; 701)]. Defendants base this objection on Rules 602 and 701.   Rule 602 requires a witness to have personal knowledge of the matter about which she testifies.   *See* Fed. R. Evid. 602.   Rule 701 provides, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:   (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge."   Fed. R. Evid. 701.

The Court concludes that Kane's assertion that her husband was "impressed" by Plaintiff's energy was based upon her personal knowledge of observing her husband on the evening in question and that the impression constitutes admissible opinion testimony because it is based upon Kane's perception of her husband.   The Court further concludes that Kane's affidavit assertion is helpful to determining a fact in dispute—*i.e.*, whether Defendants' stated reasons for their adverse employment actions were a pretext for discrimination.   In addition, the Court concludes that Kane's conclusion that her husband was impressed by Plaintiff's energy is not based upon scientific, technical, or specialized knowledge.   Thus, the Court rejects Defendants' argument that paragraph six is inadmissible because it violates Rules 602 and 701.

Defendants last attempt to persuade the Court to strike paragraph six of Kane's declaration

on the ground that "neither of the Kane's opinions of Plaintiff's service are relevant because it is only the employer's opinions and observations that are relevant in a discrimination matter."   [*Id.* (citing Fed. R. Evid. 403)].   Defendants similarly object to the assertions in paragraphs fourteen, seventeen, and eighteen on the same ground—namely, that "Kane's opinion of Hyatt Tamaya's personnel actions is irrelevant to whether or not Hyatt Tamaya's reasons were legitimate."   [*Id.*]. Kane declares in paragraph fourteen, "When the Hyatt representative called [regarding the cash handling incident], I thought they were making a bigger deal about the mistake than the situation required."   [Doc. 52-5 at 3, ¶ 14].   She declares in paragraph seventeen, "For many years, each time we went to the Santa Ana Café, we would request to be seated in Sharon's section.   We always had great service and had developed a very nice, warm relationship."   [*Id.* ¶ 17].   And, she declares in paragraph eighteen, "I found [Sharon] to be an asset to the Hyatt and would say so on all the comment cards I would submit."   [*Id.* ¶ 18].   The Court is not persuaded that evidence regarding assessments by third-parties, such as Kane, of Plaintiff's performance is irrelevant.

The Federal Rules of Evidence provide that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."   Fed. R. Evid. 401.   Plaintiff's performance as a server makes a fact of consequence—*i.e.*, whether Defendants' reason for their adverse employments action of terminating Plaintiff was pretextual—more or less probable than it would be without the evidence.   One way of proving pretext is by establishing the falsity of an employer's assertions regarding an employee's job performance   *See infra*, Discussion, § III.A.2.b.i.   The assertions in paragraphs six, fourteen, seventeen, and eighteen, which establish that Plaintiff was, in fact, a competent server (*i.e.*, that Defendants' stated reason for her termination—poor performance—was false), therefore are relevant to claims at issue in this case.

Accordingly, the Court overrules Defendants' objections to these paragraphs.

Defendants also objections to paragraph three of Dr. Craig Clatanoff's declaration on the ground that the assertions in that paragraph are vague and constitute irrelevant opinion testimony. [Doc. 60 at 2 (citing Fed. R. Evid. 403, 701)].   Clatanoff declares in paragraph three that "Sharon did a nice job overall.   She was friendly, warm and competent."   [Doc. 52-5 at 4, ¶ 3]. Defendants maintain that "Dr. Clatanoff's opinion of Plaintiff's level of service . . . is irrelevant to Hyatt Tamaya's observations of her performance," and argue, therefore, that "this paragraph is not admissible and should be struck."   [Doc. 60 at 3].   The Court already has rejected this argument in the context of assessing the relevance of Kane's comments regarding Plaintiff's competence as a server.   For the same reason, the Court likewise rejects the argument that Clatanoff's assertions regarding Plaintiff's performance are irrelevant to this litigation.   Accordingly, the Court overrules Defendants' objection to paragraph three of Clatanoff's declaration.

Defendants also object to several paragraphs of former Santa Ana Café manager Casey Thomas's declaration.   First, Defendants object to paragraph four of Thomas' declaration on the ground that the attestations in the paragraph are vague, irrelevant, contain hearsay, and constitute impermissible lay opinion testimony.   Paragraph four provides,

> Sharon Jones always went above and beyond to take care of Hyatt guests.   I received great feedback regarding her service while I was managing during her shifts.   She had even been complimented on guest Maritz surveys. . . .   She was helpful to her shift peers and responded properly to management . . . when asked to perform job duties.   She was always prompt to work and established a good rapport among her peers.

[Doc. 52-5 at 6, ¶ 4].   Defendants argue that Thomas' statement regarding the content of certain Maritz surveys is hearsay.   [Doc. 60 at 3 (citing Fed. R. Evid. 802)].

Plaintiff offers Thomas's assertion that guests complimented her on written Maritz surveys

to establish that the guests did, in fact, compliment Plaintiff's performance and to establish that Plaintiff was, in actuality, a competent server.   Thus, Plaintiff offers the statement to prove the truth of the matter asserted in the statement.   The Court therefore concludes that the statement constitutes hearsay.   *See* Fed. R. Evid. 801(c).   The Court further concludes that Plaintiff has not established that any exception to the hearsay rule applies.   Accordingly, the Court strikes from paragraph four the following language:   "She had even been complimented on guest Maritz surveys."   [Doc. 52-5 at 6, ¶ 4].

Defendants further maintain that the "observations of Ms. Thomas are also inadmissible because they are vague as to time of observations and vague as to specific events which allegedly made Plaintiff 'helpful to her peers.'   Indeed, these statements are far to[o] imprecise and nebulous to be of any relevance."   [Doc. 60 at 3 (citing Fed. R. Evid. 401, 602)].   In support of this contention, Defendants cite Rules 401 and 602.   The Court concludes that the assertions satisfy Rule 401's relevance standard because Thomas' assertions that Plaintiff was "helpful to her shift peers," "responded properly to management," "was always prompt to work," and "established good rapport among her peers," [Doc. 52-5 at 6, ¶ 4], are sufficiently precise to render facts of consequence—*i.e.*, Plaintiff's qualifications as a server and whether Defendants' stated justification for their employment decision to terminate Plaintiff was pretextual—more or less likely, *see* Fed. R. Evid. 401.   Moreover, even if the assertions were vague, the Court holds that this deficit would impact the weight of the evidence and not its admissibility.   Accordingly, the Court overrules Defendants' relevancy objection to paragraph four.[6]

---

[6]   Defendants also contend that "statements in this paragraph regarding Ms. Thomas' impressions of Plaintiff as a server are irrelevant" because "it is only her supervisors' and managers' opinions and observations that are relevant to her discrimination and retaliation claims."   [*Id.* (citing Fed. R. Evid. 702)].   The Court rejects this argument for same reasons it rejected the argument in the

Defendants further object to paragraphs six through eight of Thomas' declaration because "her assertion of 'fact' regarding the alleged statements of Mr. Mardell and Ms. Beesley are far too vague and imprecise to be competent testimony or evidence."   [Doc. 60 at 3 (citing Fed. R. Evid. 401)].   Thomas declares in paragraph six, "Eugene Mardell would also frequently tell me to watch [Plaintiff] because she was an 'old-timer' and 'senile' and could possibly be stealing from the Hyatt by not charging guests for Brunch buffets . . . .   (I cannot remember dates or exact comments, but he made it very clear to me in sly comments that he disliked her and thought she was an 'old bat.')."   [Doc. 52-5 at 7, ¶ 6].   Thomas asserts in paragraph seven, "On a separate occasion, Pam Beesley said to me in exact quotes that 'Sharon Jones would not be a good fit in the Corn Maiden due to her age.'"   [*Id.* ¶ 7].   Thomas attests in paragraph eight, "To paraphrase what else [Beesley] continued to say in relation to Sharon's interest in working at the Corn Maiden, Pam Beesley mentioned that it would be too hard to mold Sharon into the servers they were looking for due to her age and that she would be too slow and too old-fashioned and not appealing in that restaurant as a service provider."   [*Id.* ¶ 8].   Specifically, Defendants point out that "Thomas cannot identify dates of the alleged statements nor can she recall with any precision the actual alleged statement(s) made about Plaintiff," and Defendants therefore contend that "these allegations should be disregarded as inadmissible."   [Doc. 60 at 3].

The Court rejects this argument.   The statements make a fact of consequence—namely, pretext—more or less likely.   Defendants point to no authority suggesting that Rule 401 requires that evidence be so specific as to contain an actual date or that evidence identify precise, word-for-word language.   The Court concludes that Thomas' attestations regarding Mardell's and

context of ruling upon the relevancy of Kane's and Clatanoff's assertions regarding Plaintiff's competence as a server.

Beesley's comments are relevant and admissible.   Accordingly, the Court declines to strike these statements pursuant to Rule 401.

Defendants also object to paragraphs nine and ten of Thomas' declaration on the ground that the assertions constitute "vague, inadmissible opinion testimony" and on the ground that the assertions are "based on information outside of the witness' personal knowledge."   [*Id.* (citing Fed. R. Evid. 401, 602, 701)].   Defendants maintain that Thomas' "opinion of Hyatt Tamaya's treatment of other employees should be struck and should not be considered competent evidence of Hyatt Tamaya's employee relations."   [*Id.* at 3-4].

Thomas declares in paragraph nine, "I observed Hyatt management treated older people like they were expendable," and that Hyatt "didn't believe that [older people] were the right image for their restaurants."   [Doc. 52-5 at 7, ¶ 9].   Thomas asserts in paragraph ten, "There were many times over the 2 years that I worked there that they would have me try to catch people doing the littlest things in order to dispose of them on purpose, yet they would let many other things slide for employees that they 'valued' or played favorites for."   [*Id.* ¶ 10].   Defendants argue that Thomas' opinion of Hyatt Tamaya's treatment of older employees other than Plaintiff is not based on any personal knowledge of the alleged older employees' actual circumstances of employment.

Under Rule 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."   Fed. R. Evid. 602.   Thomas' statements regarding Hyatt Tamaya's treatment of older employees or Hyatt Tamaya's opinion regarding whether older employees fit the image the hotel hoped to sustain does not concern the actual circumstances of the older employees' employment and therefore Thomas need not have personal knowledge of these circumstances to support the assertions in paragraphs nine and ten.   Thomas has articulated a basis for having personal knowledge—namely, her

personal observations of the manner in which Hyatt management treated older people and her experience of having Hyatt management instruct her to "catch" employees they did not like doing things wrong and to let "other things slide" for employees management liked.   Thus, the Court overrules Defendants' objections to paragraphs nine and ten.

Defendants also object to paragraphs nine and ten on the ground that the statements are "so vague that Hyatt Tamaya cannot possibl[y] begin to identify the alleged older employees to rebut this accusation."   [Doc. 60 at 3].   To the extent that this objection is based upon Rule 401's relevancy standard, the Court concludes that the evidence is sufficient to render a fact of consequence—namely, pretext—more or less likely, and further concludes that any lack of specificity impacts the weight, and not the admissibility, of the evidence.   To the extent the objection is based upon any other evidentiary rule, Defendants have failed to articulate the rule or to point to any other authority supporting their request to strike the assertions.   Accordingly, the Court overrules the objection.

Finally, Defendants argue that the Court should strike paragraphs nine and ten because they contain "inadmissible opinion testimony."   [*Id.*].   The Court concludes that Thomas' opinion regarding Hyatt Tamaya's treatment of older employees is based upon her perceptions (namely, her observations and her direct interactions with Hyatt management), that her observations are helpful to understanding a fact in issue (namely, pretext), and that her opinion is not based upon scientific, technical, or other specialized knowledge.   *See* Fed. R. Evid. 701. Thus, the Court overrules Defendants' Rule 701 objection to paragraphs nine and ten.

Defendants also object to specific paragraphs of Sous Chef Donald Gray's declaration. Specifically, Defendants object to paragraphs four through six, in which Gray attests to Plaintiff's job skills as a server, on the ground that these assertions are irrelevant, not based on Gray's

personal knowledge, and are improper opinion testimony.   [Doc. 60 at 4 (citing Fed. R. Evid. 401, 602 and 701)].   Gray asserts in paragraph four, "Sharon was one of the best servers that I have worked with in my twenty years of restaurant experience."   [Doc. 52-5 at 8, ¶ 4].   Gray declares in paragraph five, "Sharon was excellent at selling the higher priced, specialty entrees because of her sales ability and connection to the guests."   [*Id.* at 9, ¶ 5].   Gray states in paragraph six, "Sharon was regularly assigned a bigger section than the other servers because she was a better server and could handle more tables than the other servers."   [*Id.* ¶ 6].   Defendants argue that "Mr. Gray was a sous chef and did not work in the front of the restaurant; thus, he has not established a basis for knowledge for observing Plaintiff's skills as a server.   Moreover, as discussed above, a co-worker's opinions of an employee's skills and qualifications are wholly irrelevant to whether or not that employee suffered discrimination."   [*Id.*].

The Court already has rejected Defendants' latter argument and has held that the opinions of third parties regarding Plaintiff's performance as a server are relevant to this litigation.   The Court further rejects Defendants' contention that Gray's assertions are not based upon personal knowledge simply because he worked in the kitchen and not in the front of the restaurant.   The evidence before the Court indicates that, while a server's duties involve work in the front of a restaurant, they also involve duties in the back of the restaurant, such as placing and picking up orders from the kitchen and communicating with the kitchen regarding orders placed.   Indeed, Defendants' evidence itself confirms that kitchen staff should and do have interaction with wait staff and Defendants cite this evidence to support their assessment of Plaintiff's performance.

Further, as with Thomas, Defendants also object to the statements in paragraphs nine, eleven, twelve, and fifteen, regarding Mardell's and Beesley's alleged statements about Plaintiff's age, on the ground that these assertions "are vague as to time, location, context, etc.; thus, they are

unreliable as evidence." [*Id.*].  Gray asserts in paragraph nine, "On a handful of occasions, I overheard Eugene Mardell and Pamela Beesley making jokes about Sharon's age." [*Id.* ¶ 9]. Paragraph eleven asserts, "I also heard Mardell joke with . . . Frazier about Sharon's age." [*Id.* ¶ 11].  Gray attests in paragraph twelve, "I heard Mardell call Sharon 'senile' to Frazier as well as make other derogatory comments about her age." [*Id.* ¶ 12].  Gray declares in paragraph fifteen, "When the restaurant was busy and all of the servers were getting behind, Mardell and Beelsey would single out Sharon for criticism." [*Id.* ¶ 15].  The Court already has rejected this argument in the context of evaluating Defendants' objections to Thomas's assertions regarding age-related comments of Mardell's and Beesley's.  That same reasoning applies with respect to Gray's assertions.  Thus, the Court overrules Defendants' objections to paragraphs nine, eleven, twelve, and fifteen.[7]

      B.    <u>Remaining Objections</u>.

Defendants object to Raymond Russo's testimony that higher management considered Plaintiff "too old" to work at The Corn Maiden on the ground that the testimony constitutes inadmissible hearsay.  [Doc. 41 at 21].  Defendants maintain that Russo's testimony is based upon a comment that Beesley made and argue that "Beesley was clear that it was *not her* opinion that Jones was 'too old' to work in the Corn maiden; rather, she was only repeating an alleged opinion of an unknown, unnamed person in 'higher management.'" [*Id.*].  Thus, Defendants contend that "to the extent this alleged statement is intended to prove that Hyatt Tamaya believed

---

[7]  Defendants object to Gray's statements in paragraph eighteen regarding his belief for the reasons Defendants terminated Plaintiff.  Paragraph eighteen asserts, "Based on my experience with Sharon Jones and the Hyatt, I believe that she was terminated from the Santa Ana Café because of her age." [Doc. 52-5 at 9, ¶ 18].  According to Defendants, "This is unquestionably improper opinion testimony, and it is not something that is within this witness' base of knowledge." [Doc. 60 at 4 (citing Fed. R. Evid. 602, 701)].  Because the Court does not rely upon this testimony to render its decision, the Court declines to address Defendants' objection.

Jones to be 'too old' to work in the Corn Maiden, it is inadmissible hearsay."   [*Id.* (citing *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) ("Hearsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment.")].

Hearsay is defined as "a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Beesley's statement that an unnamed manager believed Plaintiff was too old to work at The Corn Maiden is not offered to prove the truth of the matter asserted—*i.e.*, that Plaintiff was, in fact, too old to work at the restaurant—but rather as circumstantial evidence of Beesley's and the unnamed manager's state of mind. Thus, the Court overrules Defendants' hearsay objection to the statement.

III.   <u>First Motion for Summary Judgment [Doc. 41]</u>.

Defendants move for summary judgment on Plaintiff's ADEA, NMHRA, defamation, and breach of contract claims on several grounds. First, Defendants contend that the Court should grant summary judgment on Plaintiff's ADEA and NMHRA retaliation and discrimination claims because Plaintiff relies upon an improper standard of proof and she fails to identify facts demonstrating that Defendants' stated reason for their termination of Plaintiff's employment was a pretext for retaliation or discrimination. With respect to Plaintiff's retaliation claims, Defendants further argue that Plaintiff fails to identify evidence establishing that she engaged in statutorily-protected activity. Second, Defendants maintain that they are entitled to summary judgment on Plaintiff's defamation claims because she has failed to identify evidence establishing that Defendants made a defamatory statement about Plaintiff, that they published this statement to a third party, that Plaintiff suffered any damage to her reputation as a result of the publication, or that their qualified intra-corporate privilege is inapplicable. Third, Defendants maintain that they are entitled to summary judgment on Plaintiff's breach of contract claims because Plaintiff has

failed to present evidence of a valid employment contract.   Fourth, Defendants argue that the

Court should grant summary judgment on Plaintiff's ADEA claims against Beesley, Frazier, and

Mardell on the ground that individual supervisors are not liable under the ADEA.   The Court

addresses each of these arguments in turn

      A.     <u>Factual Questions Preclude Summary Judgment on Plaintiff's ADEA and NMHRA</u>
                      <u>Claims</u>.

Plaintiff brings claims under the ADEA and NMHRA for retaliatory as well as

discriminatory discipline and discharge.[8]   The ADEA and NMHRA prohibit employers both from

retaliating against employees because they have opposed discrimination and discriminating

against employees because of their age.[9]

Defendants move for summary judgment on Plaintiff's ADEA and NMHRA retaliation

and discrimination claims on several grounds.   First, as a threshold matter, Defendants contend

that they are entitled to summary judgment on these claims because Plaintiff relies upon an

---

[8]   Defendants point out that although Plaintiff alleges that her retaliation claims premised upon
her complaint of age discrimination arise under Title VII and not the ADEA, it is the ADEA that
covers an age-based retaliation claim.   Doc. 59 at 2 (citing 29 U.S.C. § 626(d))].   Defendants,
therefore, properly analyze Plaintiff's retaliation claims under the ADEA.   Plaintiff does not
object to Defendants' analysis.

[9]   In particular, with respect to discrimination, the ADEA provides that "[i]t shall be unlawful for
an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate
against any individual with respect to his compensation, terms, conditions, or privileges of
employment, *because of* such individual's age," 29 U.S.C. § 623(a)(1), and the NMHRA provides
"[i]t is an unlawful discriminatory practice for . . . an employer . . . to refuse to hire, to discharge, to
promote or demote or to discriminate in matters of compensation, terms, conditions or privileges
of employment against any person otherwise qualified because of . . . age," N.M. Stat. Ann. §
28-1-7(A).   With respect to retaliation, the ADEA provides that "[i]t shall be unlawful for an
employer to discriminate against any of his employees . . . because such individual . . . has opposed
any practice made unlawful by this section," 29 U.S.C. § 623(d), and the NMHRA declares it an
unlawful discriminatory practice for "any person or employer to . . . engage in any form of threats,
reprisal or discrimination against any person who has opposed any unlawful discriminatory
practice or has filed a complaint . . . under the Human Rights Act," N.M. Stat. Ann. § 28-1-7(I)(2).

improper standard of proof.   Second, Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff has not established that she engaged in protected activity and because she has not pointed to evidence that creates a factual dispute whether their stated reason for their employment decisions was a pretext for retaliation.   Third, Defendants maintain that they are entitled to summary judgment on Plaintiff's discrimination claims because Plaintiff has not identified evidence that raises a jury question whether Defendants' stated reason for their adverse employment actions was a pretext for discrimination.

Plaintiff, in contrast, argues that the Court should deny Defendants' request for summary judgment on her retaliation claims because a factual dispute exists with respect to whether she engaged in protected activity and whether Defendants' stated reasons for their adverse employment actions were pretextual.   Plaintiff maintains that the Court should deny Defendants' request for summary judgment on Plaintiff's discrimination claims because the direct evidence of discrimination is sufficient to withstand summary judgment and because Plaintiff's indirect evidence of discrimination creates a factual dispute on the question of pretext.

The Court first addresses whether Plaintiff has relied upon an improper standard of proof and holds that she properly relies upon the *McDonnell Douglas* analysis to present indirect evidence of retaliation and discrimination to substantiate her retaliation and discrimination claims. The Court next considers whether Defendants are entitled to judgment in their favor on Plaintiff's ADEA and NMHRA retaliation claims and holds that Plaintiff has pointed to evidence which creates a factual dispute on the questions whether Plaintiff engaged in statutorily-protected activity and whether Defendants' proffered reason for their employment actions was a pretext for retaliation and that these disputes are sufficient to withstand summary judgment.   The Court last evaluates whether Defendants' are entitled to summary judgment on Plaintiff's ADEA and

NMHRA age discrimination claims and holds that Plaintiff has identified a factual dispute on the question of pretext which precludes judgment in Defendants' favor.

        1.      <u>Plaintiff Properly Relies Upon the *McDonnell Douglas* Framework</u>.

As a threshold matter, Defendants maintain that Plaintiff relies upon an incorrect standard of proof to support her retaliation and discrimination claims. [Doc. 59 at 3; Doc. 41 at 17]. The Court rejects this argument, however, and holds that Plaintiff properly relies upon the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), to present indirect evidence in opposition to Defendants' motion.

In support of their contention that Plaintiff relies upon an improper standard of proof, Defendants cite the Supreme Court's decision in *Gross v. FBL Financial Services*, in which the Court eliminated the mixed-motives analysis that circuit courts had brought into the ADEA from Title VII cases. *See* 557 U.S. 167, 170 (2009). Defendants properly assert that, in *Gross*, the Supreme Court held that an ADEA claim requires proof of "but for" causation. *See id.* at 168. Defendants also argue that *Gross* is applicable to the NMHRA, because New Mexico courts have adopted the federal framework for claims under the state statute. [Doc. 41 at 17 (citing *Slusser v. Vantage Builders*, 2013 WL 2349473 (N.M. App. 2013)]. Defendants fail to support these conclusions with an articulation of how Plaintiff relies upon an incorrect standard of proof or why her evidence falls to pass muster under *Gross*. [Doc. 59 at 3; Doc. 41 at 17]. In the absence of any such argument, and having found no legal support for Defendants' contention, the Court holds that Plaintiff properly identifies and relies upon the appropriate standards of proof applicable to ADEA and NMHRA claims.

A plaintiff alleging discrimination or retaliation may prove her case by direct or circumstantial evidence. *See  Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008)

(citation omitted), *cert. denied*, 130 S. Ct. 69 (2009); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000), *cert. denied*, 531 U.S. 876 (2000). Direct evidence is evidence from which the trier of fact may conclude, without inference, that the employment action was undertaken because of the employee's protected status or because of her protected activity. *See Sanders*, 544 F.3d at 1105; *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007). "Usually, however, a plaintiff will not have direct evidence of discrimination [or retaliation] and will establish her claims through circumstantial evidence." *Sanders*, 544 F.3d at 1105.

Plaintiff maintains that she has pointed to indirect evidence of retaliation and discrimination that is sufficient to withstand summary judgment on her ADEA and NMHRA claims. The Tenth Circuit has held that a plaintiff with only circumstantial evidence of discrimination or retaliation may rely upon the *McDonnell Douglas* burden-shifting framework to substantiate an ADEA claim. *See Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278-79 (10th Cir. 2010) (explaining that although the Supreme Court has "left open the question of 'whether the evidentiary framework of [*McDonnell Douglas*], utilized in Title VII cases, is appropriate in the ADEA context,'" the Tenth Circuit has "long held that plaintiffs may use the *McDonnell Douglas* three-step analysis to prove age discrimination under the ADEA") (quoting *Gross*, 129 S. Ct. 2343); *Lujan v. Walters*, 813 F.2d 1051, 1058 (10th Cir. 1987) (applying the *McDonnell Douglas* framework to an ADEA retaliation claim). The New Mexico Supreme Court likewise has applied this framework to NMHRA age discrimination claims. *See Smith v. FDC Corp.*, 787 P.2d 433, 436-37 (1990). Thus, the Court approves of Plaintiff's reliance upon this framework for substantiating her ADEA and NMHRA claims.

Under *McDonnell Douglas*, "a plaintiff 'bears the initial burden of setting forth a prima facie case of discrimination'" or retaliation. *Sanders*, 544 F.3d at 1105 (quoting *Sanchez v.*

45

*Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998)); *Cates v. Regents of N.M. Inst. Of Min. &*

*Tech.*, 954 P.2d 65, 70 (N.M. 1988).   "After the plaintiff makes a prima facie case, the burden

shifts to the employer to give a legitimate, nondiscriminatory [or nonretaliatory] reason for its

employment decision."   *Sanders*, 544 F.3d at 1105 (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319,

1323 (10th Cir. 1997)); *Cates*, 954 P.2d at 70.   "If the employer comes forward with a

nondiscriminatory [or nonretaliatory] reason for its actions, the burden then reverts to the plaintiff

to show that there is a genuine dispute of material fact as to whether the employer's proffered

reason for the challenged action is pretextual—*i.e.*, unworthy of belief."   *Morgan*, 108 F.3d at

1323 (quotations omitted); *Cates*, 954 P.2d at 70.   A plaintiff who demonstrates pretext gets "over

the hurdle of summary judgment."   *Morgan*, 108 F.3d at 1323.

   Defendants suggest that the Supreme Court's decision in *Gross* impacts the standard of

proof applicable to Plaintiff's claims or otherwise renders her evidence insufficient to survive

summary judgment.   The Court disagrees.   The Tenth Circuit in *Jones v. Oklahoma City Public*

*Schools*, specifically addressed the applicability of the Supreme Court's decision in *Gross* to the

evidentiary burdens established under the *McDonnell Douglas* framework and held that *Gross*

"has no logical effect on the application of *McDonnell Douglas* to age discrimination claims" and

that *Gross* therefore does not overturn Tenth Circuit precedent applying *McDonnell Douglas* to

ADEA cases.   *See* 617 F.3d at 1278; *see also Phillips v. v. Pepsi Bottling Group*, No. 08-1003,

2010 WL 1619259, *2-3 (10th Cir. Apr. 22, 2010) (explaining that *Gross* eliminated the

mixed-motives analysis circuit courts had imported from Title VII into the ADEA and held that a

plaintiff must establish that age was the "but for" cause of the challenged employment action).

The *Jones* court explained, "*Gross* held that 'the burden of persuasion [n]ever shifts to the party

defending an alleged mixed-motives discrimination claim brought under the ADEA.'"   *Id.* (citing

*Gross*, 129 S. Ct. at 2348).   The *Jones* court reasoned that "*McDonnell Douglas*, however, does not shift the burden of persuasion from the plaintiff to the defendant.   Rather, it shifts only the burden of production."   *Id.* (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003)).   Therefore, "[t]hroughout the three-step process, '[t]he plaintiff . . . carries the full burden of persuasion to show that the defendant discriminated on [an] illegal basis.'"   *Id.* (quoting *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1125 (10th Cir. 2005)); *Garcia-Montoya v. State Treasurer's Office*, 16 P.3d 1084, 1099 (N.M. 2001) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (internal quotations and citation omitted).   The *Jones* court acknowledged that "*Gross* created some uncertainty regarding burden-shifting in the ADEA context," but concluded that "it does not preclude our continued application of *McDonnell Douglas* to ADEA claims."   *Id.* at 1278-79 (citing *Phillips*, 2010 WL 1619259, at *3 ("*Gross* did not overrule circuit precedents in which we have consistently employed the [*McDonnell Douglas*] burden-shifting framework in ADEA cases")); *id.* at 1279 ("join[ing] all of our sibling circuits that have addressed this issue" and holing that *Gross* does not overrule circuit precedents employing the *McDonnell Douglas* framework) (citations omitted).

To the extent Defendants maintain that Plaintiff improperly utilizes a mixed-motives standard of evidence and thereby shifts the burden of persuasion to Defendants, the Court rejects this argument.   Plaintiff expressly relies upon the *McDonnell Douglas* framework to withstand summary judgment on her ADEA and NMHRA claims.   [Doc. 52 at 20-21].   Plaintiff properly articulates the *McDonnell Douglas* standard and describes it as shifting the burden of production, not persuasion, to Defendants.   [*Id.* at 21].   The Tenth Circuit in *Jones* explained that the *McDonnell Douglas* analysis is consistent with *Gross* because it does not shift the burden of

persuasion to the defendant and the *Jones* court therefore held that the *McDonnell Douglas* framework survives *Gross* as a method of proving an ADEA claim.   Although the Supreme Court of New Mexico has not opined on the issue, the Court predicts that the state Supreme Court either would agree with the Tenth Circuit's reasoning in *Jones* or would apply the Tenth Circuit's mixed-motives standard applicable to Title VII cases,[10] in which case, under either scenario, Defendants' argument that Plaintiff improperly relies upon the mixed-motives standard would not have merit.   For these reasons, and because the Court perceives no other error in Plaintiff's reliance on *McDonnell Douglas* to prove her ADEA and NMHRA claims, the Court rejects Defendants' contention that Plaintiff relies upon an improper standard of proof and declines to grant summary judgment in Defendants' favor on this ground.

2.   <u>Factual Disputes Preclude Summary Judgment on Plaintiff's ADEA and NMHRA Retaliation Claims.</u>

Defendants next argue that they are entitled to summary judgment on Plaintiff's ADEA and NMHRA claims for retaliatory discipline and discharge because Plaintiff has not satisfied her evidentiary burdens under the *McDonnell Douglas* framework.   First, Defendants contend that Plaintiff has failed to point to evidence which establishes a prima facie case of retaliation—namely, that she engaged in statutorily-protected activity.   Second, Defendants

---

[10]   This Court has held that if a federal district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion [that [governs] a particular area of substantive law . . . [the federal district court] must . . . predict how the Supreme Court of New Mexico would [rule]." *Guidance Endodontics, LLC v. Dentsply Intern., Inc.*, 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010); *see also Mosley v. Titus*, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010) (noting that the Court's task, as a federal district court sitting [in diversity jurisdiction] in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it") (citing *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007) (explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).

48

maintain that Plaintiff has failed to come forward with evidence indicating that Defendants' proffered reason for their adverse employment actions—*i.e.*, plaintiff's poor job performance—was a pretext for retaliation.

The Court is not persuaded by either of these arguments.  Plaintiff has pointed to facts which create a genuine dispute whether she engaged in statutorily-protected opposition to discrimination and whether Defendants' stated reason for their employment actions was pretextual.  Having held that Plaintiff has pointed to facts which, construed in her favor, satisfy her evidentiary burdens under the *McDonnell Douglas* framework, the Court denies Defendants' request for judgment on Plaintiff's ADEA and NMHRA retaliation claims.

        a.      <u>A Dispute of Fact Precludes Summary Judgment on the Question Whether Plaintiff Engaged in Statutorily-Protected Activity</u>.

Under the *McDonnell Douglas* framework, a plaintiff asserting a retaliation claim first must establish a prima facie case.  To state a prima facie case of retaliation under the ADEA, a plaintiff must show that (1) she "engaged in a protected opposition to discrimination; (2) a reasonable employee would have considered the challenged employment action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action."  *Hinds v. Sprint/United Mgmt. Co*., 523 F.3d 1187, 1202 (10th Cir. 2008); *see Juneau v. Intel Corp.*, 127 P.3d 548, 552 (N.M. 2005) (one element of an NMHRA retaliation claim is a showing that the plaintiff engaged in protected activity).

Defendants argue that Plaintiff's retaliation claims under the ADEA and NMHRA fail because Plaintiff cannot establish that she engaged in statutorily-protected opposition to discrimination prior to her termination.   [Doc. 41 at 18].   According to Defendants, the undisputed evidence demonstrates that, while Jones complained to management, she only

complained about management styles, a negative working environment, and the fact that she had not been transferred to The Corn Maiden," and that "Jones never reported prior to termination that her alleged negative treatment was due to her age."   [*Id.* at 19].

Although protected activity includes voicing informal complaints to supervisors, a complaint is not a "protected activity and will not support a retaliation claim" when a plaintiff makes only "[a] vague reference to discrimination and harassment without any indication that this misconduct was motivated by age."   *Rangel v. Sanofi Avetis U.S., LLC*, No. 12-3085, 2013 U.S. App. LEXIS 879, *13 (10th Cir. Jan. 14, 2013); *see Juneau*, 127 P.3d at 552 ("[t]he NMHRA protects against discriminatory treatment, not against general claims of employer unfairness"). This is because "[a]n employer cannot engage in unlawful retaliation if it does not know that the employee at least in part is engaging in protected activity."   *Rangel*, 2013 U.S. App. LEXIS 879, at *13 (holding that a plaintiff who complained that his supervisor's "critiques were unfair and harsh" but who did not present "evidence that he ever asserted a belief to his [employer] prior to his [charge of discrimination] that he was being discriminated against in any way because of his age or any other protected classification" did not engage in protected activity); *see also Shah v. Okla. Dep't of Mental Health & Substance Abuse*, No. 11-6305, 2013 U.S. App. LEXIS 19059, *12 (10th Cir. Sept. 11, 2012) (holding that a plaintiff who complained of "verbal abuse" did not engage in protected activity).

Defendants contend that Plaintiff complained only of general discrimination or harassment and not discrimination based upon her age.   The Court is not persuaded by this argument. Rather, the Court concludes that Plaintiff's evidence, construed in her favor, establishes that she did, in fact, complain about age discrimination to the corporate Human Resources Department and to Hyatt Tamaya management prior to her termination.   Thus, a question of fact precludes

summary judgment in Defendants' favor.

Plaintiff's evidence demonstrates that she complained of age discrimination to Mueller during her June 20, 2011, telephone call to the corporate Human Resources Department. Although Plaintiff does not directly testify that she reported age discrimination to Muller, the facts construed in Plaintiff's favor suggest precisely this.   Plaintiff testified that she and Mardell spoke on the telephone on June 21, 2011, and Plaintiff had with Mardell "the *same discussion* that [she] had with Kate Muller" on June 20, 2011, discussing "the work environment, the age discrimination that [she] was feeling, [and] the fact that [she] felt that he . . . was discriminating against [her], keeping [her] from Corn Maiden" "because of [her] age."   [Doc. 41-1 at 107:12-18, 21-24 (emphasis added); *see also* Doc. 41-14 at 21].   This testimony indicates that Plaintiff reported both to Mardell and to Mueller that she felt she was being discriminated against because of her age and that management was refusing to promote her to The Corn Maiden because of her age.

Moreover, Hyatt Tamaya's internal memorandum specifically indicates that during Plaintiff's June 21, 2011, telephone conversation with Mardell, Plaintiff mentioned the 2010 position that opened up in The Corn Maiden, informed Mardell that she had wanted the job, and informed Mardell that she had heard that he had said that she was "too old to transfer there." [Doc. 41-12 at 17].   This fact of Defendants' itself, construed in the light most favorable to Plaintiff, also supports Plaintiff's testimony that she complained to Mardell that she felt she was the subject of age discrimination and that management was refusing to promote her to The Corn Maiden because of her age.

In support of their claim that Plaintiff "never reported prior to her termination that her alleged negative treatment was due to her age," [Doc. 41 at 19], Defendants point to three pieces of evidence.   The first piece of evidence upon which Defendants rely is Plaintiff's deposition.

51

Defendants argue that Plaintiff "*expressly* testified . . . that she cannot recall specifics of her conversation with Hyatt's corporate HR." [Doc. 59 at 3]. Defendants contend that because Plaintiff testified in her deposition that should could not "recall specifics," Plaintiff cannot establish that she complained of discrimination because of age during this conversation. [*Id.*]. Defendants, however, mischaracterize Plaintiff's deposition testimony by presenting an incomplete excerpt from the testimony. Plaintiff's complete testimony indicates that Plaintiff could not "recall specifics" of what *Mueller* said in response to Plaintiff's complaint, [Doc. 41-1 at 104:8-13], and not that she could not recollect what she complained of to Mueller.

The second piece of evidence upon which Defendants rely is Mueller's declaration. Mueller asserts that during Plaintiff's June 20, 2011, call, Plaintiff "brought a complaint about management's general treatment of the staff.   In particular, she complained [that] Nate Philippsen and Pam Beesley . . . mistreated the servers.   In this call, Ms. Jones did not make any reference to any purported discrimination nor did she say anything about ageist comments or attitudes.   She only complained about her managers' management styles." [Doc. 41-8, ¶ 3, at 2]. Moreover, Mueller attests that "[o]ver the next several weeks, [Mueller] had several follow up conversations with both Ms. Jones and Ms. Frazier, Eugene Mardell, . . . and Colleen Kareti," and that "[d]uring these conversations, Ms. Jones continued to complain about Hyatt Tamaya's management's treatment of her; however, she gave no indication that she believed the alleged mistreatment to be related to her age." [Doc. 41-8, ¶ 5, at 3]. Although Mueller asserts that Plaintiff merely reported general dissatisfaction with the work environment, and not discrimination based upon age or another protected category, Plaintiff has pointed to evidence which creates a factual dispute on this question. *See supra*, Discussion, § III.A.2.a. Moreover, in her July 6, 2011, e-mail to Frazier, Mueller admits that "continued or further documentation *could/would* be construed as

52

retaliation," [Doc. 52-10 at 6 (emphasis added)], and, when this admission is construed in Plaintiff's favor, it creates an inference that Plaintiff complained of protected discrimination. A reasonable finder of fact could conclude that Muller would not have written that further documentation "could/would" be construed as retaliation if the complaint had not been age-related. For these reasons, at best, Muller's declaration establishes only that a question of fact exists.

The third piece of evidence upon which Defendants rely is Frazier's declaration. Frazier refers to her July 6, 2011, and August 5, 2011, memoranda, in which she summarizes management's workplace investigation of Plaintiff arising out of the alleged guest complaints. [Docs. 41-12 at 16-27]. Defendants rely upon these memoranda to demonstrate that Plaintiff complained only of general workplace harassment. The Court already has explained, however, that Plaintiff's evidence refutes Frazier's assertions in her memoranda and suggests that Plaintiff did, in fact, complain of discrimination based upon age. Thus, Defendants' reliance on the memoranda is not persuasive.

b.   A Dispute of Fact Precludes Summary Judgment on the Question Whether Defendants' Stated Reason for their Employment Actions was Pretextual.

Having rejected Defendants' argument that they are entitled to summary judgment in their favor on Plaintiff's ADEA and NMHRA retaliation claims because Plaintiff has failed to identify facts which create a dispute on the question whether she engaged in statutorily-protected activity and fulfilled her prima facie burden, the Court next must determine whether Defendants have satisfied their burden of production by articulating a legitimate, non-discriminatory reason for their adverse employment actions. *See Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (once a plaintiff establishes a prima facie case, "the burden shifts to the employer to

articulate some legitimate, nondiscriminatory reason for its action"); *Cates v. Regents of N.M. Inst. Of Min. & Tech.*, 954 P.2d 65, 70 (N.M. 1988) (same).   Defendants' have identified performance problems as a justification for their decisions to discipline and terminate Plaintiff and have supported this justification with evidence of multiple guest complaints and Plaintiff's violation of Hyatt Tamaya's cash handling policy.   Defendants maintain, and the Court agrees, that these reasons are sufficient to satisfy their burden of production under the *McDonnell Douglas* framework.

Defendants next contend that they are entitled to summary judgment on Plaintiff's ADEA and NMHRA retaliation claims because Plaintiff has failed to identify facts which establish that their stated reason for their adverse employment actions was a pretext for retaliation.   The question of pretext arises only in the third and final step of the *McDonnell Douglas* inquiry, after a plaintiff has successfully established a prima facie case of retaliation and an employer has articulated a legitimate, nonretaliatory reason for an adverse employment action.   *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (citation omitted); *Cates*, 954 P.2d at 70.   At this point, the presumption of retaliation created by the plaintiff's prima facie case "simply drops out of the picture," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993), and "[t]he plaintiff then carries the full burden of persuasion to show that the defendant [retaliated] on [an] illegal basis," *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1125 (10th Cir. 2005).   Since a plaintiff utilizing the *McDonnell Douglas* framework normally cannot provide direct evidence of retaliation, "a pretext argument provides a method of satisfying this burden by allowing the fact finder 'to infer the ultimate fact of [retaliation] from the falsity of the employer's explanation." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (internal quotation marks and citation omitted); *see Cates*, 954 P.2d at 70 (pretext is a substitution for direct

evidence of discrimination).

To establish pretext, "an employee must show there is enough inconsistency or implausibility in his employer's stated explanation for the [adverse action] that a reasonable trier of fact could find it unworthy of belief." *Roberts v. Int'l Business Machines Corp.*, 733 F.3d 1306, 1309 (10th Cir. 2013) (citation omitted), *cert. denied*, 134 S. Ct. 2867 (2014); *see also Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) ("An employee may show pretext based on 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief.") (quoting *Morgan v. Hilti Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).     There are a few typical methods for a plaintiff to prove pretext.   For example, a plaintiff my prove pretext by producing evidence that (1) "the defendant's stated reason for the adverse employment action was false," *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (citation omitted); *see Juneau v. Intel Corp.*, 127 P.3d 548, 555 (N.M. 2005) (holding that evidence suggesting an employer's stated reason for an adverse action was false, in conjunction with other evidence, creates a factual dispute on the question of pretext); (2) that "the defendant acted contrary to a written" or "unwritten company policy" "prescribing the action to be taken by the defendant under the circumstances," *Kendrick*, 220 F.3d at 1230 (citation omitted); *see Sonntag v. Shaw*, 22 P.3d 1188, 1203 (N.M. 2001) (acknowledging that a "jury can properly infer the ultimate fact of intentional discrimination from disparate treatment"); (3) that the adverse employment action occurred in "close temporal proximity" to a plaintiff's protected activity, *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004) (close temporal proximity is a factor in showing pretext); and (4) that the employer treated the plaintiff differently prior to the protected activity, *see Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1174 (10th Cir. 2006)

(explaining that "'evidence of pretext may include [evidence of an employer's] prior treatment of plaintiff'"); *Juneau*, 127 P.3d at 555 (considering evidence of treatment prior to protected activity—*i.e.*, that the plaintiff "received no discipline for performance issues until after his EEOC complaint was filed"—as evidence indicative of pretext).   Plaintiff's evidence falls into each of these categories.

i.   <u>Falsity Evidence</u>.

Plaintiff produces evidence that Defendants' stated reason for disciplining and terminating her was false.   From the falsity of Defendants' explanation, the Court "can reasonably infer . . . that [Defendants are] dissembling to cover up a [retaliatory] purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *accord Garcia-Montoya v. State Treasurer's Office*, 16 P.3d 1084 (N.M. 2001); *Juneau*, 127 P.3d at 555.   The falsity inquiry does not seek to invalidate an employer's stated reason simply because the employer honestly, but mistakenly, believed the reason.   Rather,

> [T]he relevant "falsity" inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination.   The reason for this rule is plain: [a court's] role is to prevent intentional discriminatory hiring practices, not to act as a "super personnel department," second guessing employers' honestly held (even if erroneous) business judgments.

*Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (citation omitted).

Under this standard, Plaintiff must "present evidence that [Defendants] did not honestly believe that her [job performance was poor] and [did not] decide in good faith to [discipline or terminate] her . . . on [this] basis." *Id.* at 1251-52 (rejecting the contention that pretext is shown

56

solely by demonstrating that the "true facts" associated with the termination differ from what the employer honestly believed); *see also Cypert v. Indep. Sch. Dist. No. I-050*, 661 F.3d 477, 485 (10th Cir. 2011) (noting mistaken belief can be legitimate, non-pretextual reason).   To this end, Plaintiff points to multiple pieces of evidence to establish that Defendants' assertions of her poor performance were false and not honestly held.

First, Plaintiff presents evidence indicating that Defendants falsely and in bad faith represented that Debra Kane complained about Plaintiff's service.   This evidence establishes that Defendants misrepresented that Kane complained to Hyatt Tamaya regarding Plaintiff's July 30, 2011, violation of the hotel's cash handling policy when in fact Hyatt Tamaya solicited the complaint from Kane.   Frazier's memorandum dated August 5, 2011, asserts that Hyatt Tamaya learned of Plaintiff's unintentional violation of the cash handling policy when Kane called the hotel to correct the overcharge to her credit card, [Doc. 41-12 at 26], and that Hyatt Tamaya would not have known of the overcharge if Kane had not reported it to the hotel, [*id.* at 27].   Kane states in her declaration, however, that—contrary to Frazier's representation—it was a representative of Hyatt Tamaya who contacted Kane by telephone regarding the overcharge, and not Kane who contacted the hotel, and that the representative made "a bigger deal about the mistake than the situation required."   [Doc. 52-5 at 2].   The evidence also establishes that Defendants falsely represented that Kane complained about Plaintiff's service when Kane actually had a positive opinion of Plaintiff's qualities as a server.   Kane asserts that on the night of the incident she requested Plaintiff as her server, that the restaurant was busy and short-staffed, and that Kane and her husband were impressed with Plaintiff's energy; in addition, Kane declares that "[f]or many years, each time [she] went to The Santa Ana Café, [she] would request to be seated in Sharon's section," that Plaintiff "always" provided "great service," that Kane "had developed a very nice,

warm relationship with Sharon," and that Kane "found [Plaintiff] to be an asset to the Hyatt."   [*Id.* at 2-3].   Thus, the Kane declaration indicates that Defendants manufactured a complaint about Plaintiff when Kane actually held a positive opinion of Plaintiff, thus raising a question whether Defendants held a good faith belief that Plaintiff's cash handling violation merited the discipline she received.

In addition to the foregoing evidence of falsity, Plaintiff also presents evidence that her co-workers and a former manager had a high opinion of her performance and that Defendants misrepresented that her co-workers had complaints about her performance, thus suggesting that Defendants did not hold an honest belief that she suffered from performance problems.   Plaintiff points to the declaration of Casey Thomas, a former Assistant Restaurant Manager for The Santa Ana Café, in which Thomas attests that Plaintiff "always went above and beyond to take care of Hyatt guests," and that Thomas received "great feedback regarding Plaintiff's service," [*id.* at 6 ¶ 4].   Plaintiff also identifies the declaration of Sous Chef Donald Gray, in which he attests that Plaintiff was "one of the best servers that [he has] worked with in [his] twenty years of restaurant experience," and that Plaintiff "was regularly assigned a bigger section than the other servers because she was a better server."   [*Id.* at 8, ¶ 4; *id.* at 9, ¶ 6].   Plaintiff likewise refers to the testimony of Raymond Russo, a fellow server, who testified that Plaintiff was, by a large margin, the most requested server.   [Doc. 52-3, at 58:8-59:1].   Finally, Plaintiff testified that the servers with whom Mardell solicited comments collectively informed her that Mardell would falsely represent to Plaintiff that they "threw [Plaintiff] under the bus" when they did not do so.   [Doc. 41-1 at 113:15-25].   This evidence from Plaintiff's co-workers and her former manager suggests that Plaintiff did not suffer from performance problems and that Defendants' reliance upon performance problems as a justification for their employment decisions was insincere.

The last type of falsity evidence establishes that Defendants singled Plaintiff out for criticism, when they did not do this to other employees, which suggests that Defendants were, in bad faith, manufacturing justifications for their employment decisions.   Plaintiff points to Gray's declaration, in which he asserts that "Mardell and Beesley asked [him] more than once how [he] felt about Sharon and her performance," that "[he] felt that they were singling her out because they did not ask [him] about other servers' performance in the same way," and that "[w]hen the restaurant was busy and all of the servers were getting behind, Mardell and Beesley would single out Sharon for criticism."   [Doc. 52-5 at 9, ¶¶ 13, 14, 15].   Likewise, Plaintiff points to former manger Thomas's declaration, in which she attests that "[t]here were many times over the 2 years that [she] worked [at The Santa Ana Café] that [management] would have [her] try to catch people doing the littlest things in order to dispose of them on purpose, yet they would let many other things slide for employees that they 'valued.'"   [*Id.* at 7, ¶ 10].   Plaintiff also points to evidence which suggests that, in contravention of Hyatt Tamaya's written policies, Defendants singled Plaintiff out by disciplining her more harshly than their written and unwritten policies.   *See infra*, Discussion, § III.A.2.b.ii.

From all of the foregoing evidence of falsity, Plaintiff contends that a trier of fact reasonably could infer that Defendants possessed a retaliatory motive for their employment actions of disciplining, suspending, and/or terminating her.[11]   The Court agrees.   Plaintiff's

---

[11]   Plaintiff also attempts to establish falsity by arguing that Defendants have not produced written complaints, testimony, or statements from the guests allegedly complaining and arguing that Defendants rely only upon internal memoranda to substantiate the guest complaints.   [Doc. 52 at 19, 24].   Defendants argue, however, that in her deposition Plaintiff admits that three of the four verbal customer complaints to management occurred and that Plaintiff presents no evidence that Defendants fabricated the complaints. [Doc. 59 at 4].   Plaintiff cites no authority, and the Court finds none, indicating that the Court can infer falsity because Defendants failed to substantiate their stated reason for their employment decisions with statements from the allegedly-complaining

evidence of falsity creates a reasonable inference from the falsity of the explanation that Defendants were claiming that Plaintiff was performing poorly to cover up a retaliatory purpose. *Cf. Reeves*, 530 U.S. at 147; *see also Twigg*, 659 F.3d at 1001.   Plaintiff's evidence, construed in her favor, establishes that that Defendants manufactured a guest complaint against Plaintiff, falsely characterized Plaintiff's co-workers as having a low opinion of Plaintiff's performance when her co-workers and a former manager had a high opinion of Plaintiff, and that Defendants singled Plaintiff out for criticism and discipline when she was performing at the same level as her co-workers.   The Court concludes that this evidence raises a question of fact whether Defendants honestly and in good faith believed that Plaintiff's job performance was poor.     The   Court   is not persuaded to hold otherwise by Defendants' arguments to the contrary.   Defendants contend first that there is no dispute that the customer complaints and cash mishandling occurred and next that, although Plaintiff's evidence establishes that "specific customers [who complained] may have been more indulging [than Hyatt Tamaya]," this "is irrelevant to Hyatt Tamaya's personnel decision," because "it is only the assessment by Hyatt Tamaya's management that is relevant." [Doc. 59 at 6].   The Court is not persuaded.

Contrary to Defendants' contention that no dispute of fact exists with respect to whether the complaints occurred, Plaintiff's evidence that Kane did not complain about Plaintiff's service creates a factual dispute.   Moreover, contrary to Defendants' contention that Kane's positive opinions about Plaintiff are irrelevant, this Court has explained why evidence from third parties suggesting that an employer manufactured complaints where none existed and relied upon those false complaints to justify adverse actions is relevant to the falsity inquiry.   *See supra* at 58-59.

guests.   Thus, the Court is not persuaded that Defendants' failure to attach written statements from the guests constitutes evidence establishing the falsity of the complaints.

Defendants also argue that the Court should disregard Plaintiff's evidence of falsity because opinions of guests or Plaintiff's co-workers and a former manager are not probative of pretext.   Defendants rely upon Tenth Circuit precedent holding that, in evaluating an employer's business reason for an employment decision, the relevant inquiry is "whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue," [*id.* at 5 (quoting *Simmons v. Sykes Enters., Inc*., 647 F.3d 943, 947 (10th Cir. 2011)], and instructing that, in determining whether an employer honestly held a belief, courts must "look at the facts as they appear to the person making the decision to terminate," because a court is not "a super personnel department that second guesses employer's business judgments," [*id.* (quoting *Simmons*, 647 F.3d at 948)].   Defendants last argue that other circuit courts have held that opinions of co-workers are not relevant to the pretext inquiry.   [*Id.*].

Defendants' arguments miss the mark.   Plaintiff does not argue, or present evidence suggesting, that the facts perceived by management appeared different at the time management made the decision to discipline and terminate Plaintiff than the facts are now known to be.   If the facts had appeared one way to management at the time of its decision, but, as they are now known to be are understood to have been false (thereby rendering management's assessment of Plaintiff's performance untrue), then the propositions advanced by Defendants would apply and the Court would not be authorized to act as a super-personnel department and second guess Defendants' honestly-held, but mistaken, business judgments.

Plaintiff's evidence, however, suggests not that Defendants were under a misapprehension of the facts but rather that Defendants did not honestly believe their stated justification for their decisions and that their decisions were premised instead upon a retaliatory motive.   Thus, the Court rejects Defendants' assertion that the Court would be acting as a super-personnel department

if it were to consider Plaintiff's third-party evidence.

Likewise, the Court is not persuaded by the authority Defendants identify from the Fourth and Seventh Circuits.  Defendants cite *Luks v. Baxter Healthcare Corporation*, in which the Seventh Circuit opined that "the fact that [the plaintiff's] coworkers thought he was doing a good job is beside the point.  They were not charged with the responsibility of monitoring and evaluating Luks' work performance; [management] was."   467 F.3d 1049, 1056 (7th Cir. 2006).  Defendants also cite *Anderson v. Baxter Healthcare Corporation*, in which the Seventh Circuit held that "[t]he mere submission of materials from a coworker or supervisor indicating that an employee's performance is satisfactory . . . does not create a material issue of fact," 13 F.3d 1120, 1124-25 (7th Cir. 1994), and *Hawkins v. Pepsico, Inc.*, in which the Fourth Circuit held that the "[a]lleged opinions of [the plaintiff's] coworkers as to her work qualifications are close to irrelevant."   203 F.3d 274, 280 (4th Cir. 2000).

These cases do not persuade the Court because the plaintiffs in those cases sought only to establish that their employer's held mistaken beliefs and not to establish that their employers' beliefs were dishonest.  Plaintiff, in contrast, does not present third-party opinions of her co-workers solely to refute Defendants' contention that she performed poorly.  After all, proof that Defendants mistakenly, but in good faith, believed Plaintiff to be a poor performer, when she in fact was not, cannot, as a matter of law, establish pretext.  *Cf. Young v. Dillon Cos.*, 468 F.3d 1243, 1251-52 (10th Cir. 2006) (rejecting the contention that pretext is shown solely by demonstrating that the "true facts" associated with the termination differ from what the employer honestly believed).  Rather, Plaintiff's third-party evidence suggests that Defendants did not honestly hold their opinion that Plaintiff's performance was poor.  The evidence at issue in the cases Defendants cite did not suggest that Defendants' beliefs were falsely held and therefore, in

contrast to the evidence here, that evidence was not relevant.   *See Luks*, 467 F.3d at 1056 (holding

that co-workers' opinions that the plaintiff performed well were "beside the point" because "the

relevant question is not whether the criticisms of [the plaintiff's] performance were right or wrong

but whether his supervisor honestly believed them"); *Anderson*, 13 F.3d at 1124-25 (holding that

opinions from co-workers and supervisors indicating that the plaintiff's performance was

satisfactory did not create a question of fact because the evidence did not show that the

decisionmaker "lied" by claiming that the employee was suffering from performance issues);

*Hawkins*, 203 F.3d at 280 (explaining that "opinions of coworkers as to [the plaintiff's] work

qualifications are close to irrelevant" because an employer's mistaken, but honestly-held belief, is

not sufficient to establish pretext, and holding that the plaintiff's evidence failed to show that the

employer's "assessment of her performance was dishonest" and proved "only the unremarkable

fact that [the plaintiff] and [her employer] disagreed about the quality of her work").   Because

Plaintiff's evidence from Kane, her co-workers, and her former supervisor raises a factual question

whether Defendants honestly held a belief that Plaintiff suffered from poor performance, the Court

rejects Defendants' contention that the evidence is not relevant.

ii.   <u>Deviation Evidence</u>.

To establish pretext, Plaintiff next identifies evidence that Defendants violated Hyatt

Tamaya's written and unwritten company policies.   *Cf. Kendrick v. Penske Transp. Servs., Inc.*,

220 F.3d 1220, 1230 (10th Cir. 2000) (explaining that a plaintiff can demonstrate pretext by

presenting (1) evidence that the defendant acted contrary to a written company policy prescribing

the action to be taken by the defendant under the circumstances or (2) evidence that the defendant

acted contrary to an unwritten policy or contrary to company practice when making the adverse

employment decision affecting the plaintiff).   Deviation evidence can "'permit[] a reasonable

63

inference that [the employer] acted with an ulterior motive and . . . engineered and manufactured the reasons [it] proffered for terminating [the employee's] employment.'"   *Twigg*, 659 F.3d at 1003 (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1138 n.11 (10th Cir. 2003)).

To establish that Defendants deviated from written company policy when they suspended and terminated her, Plaintiff presents evidence that management disciplined her more harshly than the recommendations in the hotel's cash handling policy.   Hyatt Tamaya's cash handing policy provides that "[a]ny failure to adhere to the[ cash handling policy] will result in progressive discipline," and that "all cash variances of $20.00 or more will . . . result in" a verbal warning for a first offense, a written warning for a second offense, a final written warning for a third offense, a suspension for a fourth offense, and termination for a fifth offense.   [Doc. 41-12 at 2].   Although the policy also provides that that the Hyatt Tamaya reserves the right to terminate any employee immediately or to accelerate disciplinary action when the circumstances warrant, including cases of intentional wrongdoing, Plaintiff argues that the circumstances of her violation did not warrant immediate termination.

The Court concludes that Plaintiff's evidence is sufficient to create a factual question whether Defendants' stated reason for their suspension and termination of Plaintiff was a pretext for retaliation.   Hyatt Tamaya's cash handling policy provides that a failure to adhere to the policy typically will result in the progressive discipline of a verbal warning for a first offense, a written warning for a second offense, a final written warning for a third offense, a suspension for a fourth offense, and termination for a fifth offense.   [*Id.*].   Although the policy also provides that the Hyatt Tamaya reserves the right to terminate any employee immediately or to accelerate disciplinary action when the circumstances warrant, the policy provides intentional wrongdoing as an example of a circumstance warranting accelerated discipline.   It is undisputed that Plaintiff did

64

not violate the cash handling policy intentionally.   Moreover, Plaintiff's evidence establishes that Kane did not complain to the hotel about the violation, that Kane was not upset about the violation, that Kane believed Plaintiff provided her with good service, and that Kane had a long and positive relationship with Plaintiff.   The Court concludes that this evidence is sufficient to raise a factual question whether the circumstances warranted Defendants' deviation from the policy's recommended steps of progressive discipline and proceeding directly to suspension and termination.   The Court further concludes that, to the extent the trier of fact were to conclude that the circumstances did not warrant deviation from the cash handling policy's guidelines, the trier of fact reasonably could infer that Defendants' deviated from written company policy to cover up their retaliatory motive.

In addition to identifying evidence of deviation from written company policy, Plaintiff also relies upon evidence that Defendants deviated from unwritten company policies to establish pretext.   Plaintiff points to evidence that Defendants treated her differently from other similarly-situated employees who violated work rules of comparable seriousness.   *Cf. Kendrick*, 220 F.3d at 1230 (explaining that, to prove pretext through evidence of deviation of an unwritten company policy or practice, a plaintiff often provides evidence that she was treated differently from other similarly-situated employees who violated work rules of comparable seriousness); *see also Sonntag v. Shaw*, 22 P.3d 1188, 1203 (N.M. 2001).   "Evidence that a similarly situated employee received better treatment can suggest that the employer's alleged nondiscriminatory reason is merely pretextual."   *Roberts v. Int'l Business Machines Corp.*, 733 F.3d 1306, 1310 (10th Cir. 2013).   "But to provide a basis for reliable comparison, the other employee must, in fact, be similarly situated—that is, reporting to the same supervisor, held to the same standards, and afoul of those standards to at least the same degree."   *Id.* (citation omitted); *see Aramburu v.*

65

*Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (internal quotations and citation omitted).

Plaintiff's evidence indicates that it is not unusual for servers to forget to order menu items, [Doc. 52-3 at 24:18-25; Doc. 52-2 at 121:11-13], and that management did not typically give servers written reprimands for failing to ring in orders, [Doc. 52-5 at 9, ¶ 16; Doc. 52-3 at 24:12-25]. Gray asserts that he "never saw a server get disciplined for forgetting to ring in an entrée." [Doc. 52-5 at 9, ¶ 16]. Likewise, server Russo states that he "periodically" forgot to ring in an order but that he has never been written up for it. [Doc. 52-3 at 24:12-25]. Gray also confirms that "[w]hen servers would forget to ring in food, it was standard for them to come straight to the kitchen and tell the chef . . . what they needed so that the chef could get it out as soon as possible," and that "[e]ither the chef on duty or the responsible server would then tell the manager on duty, who would decide whether to offer the guest a discount." [Doc. 52-5 at 9, ¶ 17].

The Court holds that Plaintiff's evidence that Hyatt Tamaya management did not typically give servers written reprimands for failing to ring in orders suggests that Defendants deviated from Hyatt's unwritten policy—*i.e.*, of not disciplining servers for failing to ring in menu items—when they counseled, disciplined, and/or terminated Plaintiff for failing to ring in orders. This evidence suggests that Defendants possessed a retaliatory motive for reprimanding Plaintiff and that, because Plaintiff's termination was based in part upon these reprimands, for terminating her.

The Court is not persuaded to hold otherwise by Defendants' argument that the evidence does not indicate that the employees whom Defendants allegedly failed to discipline had the same number of guest complaints as Plaintiff. [Doc. 41 at 23]. Under the similarly-situated standard, Plaintiff's evidence need only establish that the discipline Plaintiff actually received for an infraction of comparable seriousness was different from that received by an employee who reports to the same supervisor and is held to the same standards. *Cf. Roberts*, 733 F.3d at 1310.

Plaintiff has identified multiple instances for which she suffered an adverse employment action at least in part due to her failure to ring in an order properly, including actions after July 21, 2011.   Plaintiff also has identified similarly-situated employees—namely, Santa Ana Café servers reporting to the same supervisor-managers and subjected to the same policies and practices—who failed to ring in orders but did not receive any counseling or reprimand for their failures.   While, Defendants' contention that the employees were not similarly situated to Plaintiff with respect to her termination may have merit, because Defendants based Plaintiff's termination upon four instances of failing to ring in orders properly, one written guest Maritz survey, and one cash handling violation, and Plaintiff's evidence does not establish that Defendants retained other servers who suffered from the same or similar shortcomings, Defendants' argument does not have merit with respect to any individual counseling or reprimand Plaintiff received for failing to ring in an order.   At least one such counseling and/or reprimand occurred after July 21, 2011. Moreover, the Court specifically has held that Defendants' reprimands, while not actionable on their own, could be used as evidence to support Plaintiff's timely-filed ADEA and NMHRA claims.   Thus, the Court rejects Defendants' contention that Plaintiff's evidence of deviation from unwritten policy necessarily fails as a matter of law to create pretext.

In addition to evidence of differential treatment for servers failing to ring in orders, Plaintiff also produces evidence that Hyatt Tamaya disciplined her more harshly for her cash handling violation than another female server with a cash handling violation of $207.72, which was almost three times as great as Plaintiff's discrepancy.   Plaintiff's evidence demonstrates that Defendants gave this server a written warning and a three-day suspension, while Defendants suspended Plaintiff for her cash handling violation and terminated Plaintiff at least in part for her cash handling violation.   [Doc. 52-10 at 3].   Plaintiff also relies upon evidence that Hyatt

Tamaya gave a manager with a cash handling violation of $700, which was more than ten times as great as Plaintiff's discrepancy, only a five-day suspension without pay.   [*Id.* at 4-5].   Plaintiff argues that Defendants did not terminate this manager.   [*Id.*].

Defendants contend, however, that Plaintiff has failed to establish that these employees "violated the cash handling policy in the same way" as Plaintiff and were not terminated, or that these employees had the same number of guest complaints as Plaintiff and were not terminated. [Doc. 41 at 23].   With respect to Defendants' first argument, the Court concludes that the similarly-situated standard only requires that the employee violated a "work rule[] of comparable seriousness." *Aramburu*, 112 F.3d at 1404.   Here, Plaintiff presents evidence that an employee violated the same cash handling policy that Plaintiff violated.   Plaintiff need not further demonstrate that that violation occurred in the "same way."

With respect to Defendants' second contention, the Court agrees that Plaintiff's evidence does not pass muster under the similarly-situated standard.   As discussed, to establish pretext through differential treatment, Plaintiff must demonstrate first that she was treated differently and next that she and another employee violated rules of comparable seriousness.   Plaintiff has not demonstrated that she was treated differently from the male manager.   Rather, her evidence establishes that both Plaintiff and the manager received *similar* initial suspensions, that Hyatt Tamaya *similarly* terminated both Plaintiff and the manager based in part on their violations of the cash handling policy, and that Hyatt Tamaya similarly suspended Plaintiff and the female server.[12]

---

[12]   The Court further disregards Plaintiff's evidence regarding the male manager's cash handling violation because this employee was a manager, while Plaintiff was a server, and therefore Plaintiff and the manager were not similarly-situated.   *Cf. Aramburu*, 112 F.3d at 1404 (employees are similarly-situated if they deal with the same supervisor and are subject to the "same standards governing performance evaluation and discipline").

Plaintiff likewise has not established that the allegedly-comparable female server who Hyatt only suspended, but did not terminate, for her cash handling mistake, violated the same number of rules of comparable seriousness and yet was not terminated.[13]   Thus, because Plaintiff has not established that the servers violating the cash handling policy were similarly-situated to Plaintiff, the Court disregards this evidence of deviation.

iii.   <u>Temporal Proximity Plus Evidence</u>.

Plaintiff also presents evidence of temporal proximity to establish pretext.  The Tenth Circuit has confirmed that a plaintiff may prove pretext through evidence establishing the temporal proximity between a complaint of discrimination and a subsequent adverse employment action, because such proximity may justify an inference of retaliation.  *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004).[14]   The Tenth Circuit has held, however, that while "close temporal proximity is a factor in showing pretext," it "is not alone sufficient to defeat summary judgment."  *Id.* at 1241 (refusing to allow "'very close' temporal proximity to operate as a proxy

---

[13]   Defendants terminated Plaintiff based upon her guest complaints as well as her violation of the cash handling policy.   Plaintiff has failed to establish that the female server with the cash handling violation also had six incidents that violated Hyatt Tamaya's policies.

[14]   The New Mexico Supreme Court has neither adopted nor rejected the Tenth Circuit's temporal proximity analysis as the sole evidence of causation in a retaliation case.   In *Juneau v. Intel Corp.*, the Supreme Court "decline[d] to apply any temporal proximity analysis . . . or adopt a specific time period for inferring facts related to causation," because the plaintiff presented other evidence of pretext.   127 P.3d 548, 554 (N.M. 2005).   Thus, in *Juneau*, the court considered "temporal proximity [a]s only one piece of the evidentiary formulation offered by Plaintiff."  *Id.* (citation omitted).   The court concluded that the "fact-finder should be free to consider timing and proximity, along with all the other facts and circumstances, in deciding the ultimate issue of causation," and that the court would "leave for another day the question of when the time between the employee engaging in protected activity and the employer taking adverse action might be sufficient to allow an inference of a causal connection between the two."  *Id.*  This Court need not predict how the New Mexico Supreme Court would rule on this question, because Plaintiff here, like the plaintiff in *Juneau*, presents other evidence in addition to temporal proximity to establish pretext.

for th[e] evidentiary requirement" that the plaintiff demonstrate pretext); *see also Medina v. Income Support Div.*, 413 F.3d 1131, 1138 (10th Cir. 2005); *Pastran v K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000).   Thus, "To raise a fact issue of pretext," Plaintiff must "present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive."   *Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1172 (10th Cir. 2006) (quoting *Pastran*, 210 F.3d at 1206). The Court holds that Plaintiff's evidence of temporal proximity satisfies the "plus" standard.

Plaintiff's temporal proximity evidence demonstrates that Plaintiff complained to Mueller at the corporate Human Resources Department on June 20, 2011.   Thereafter, the evidence indicates that Defendants engaged in a pattern of conduct, which viewed in the light most favorable to Plaintiff, could be construed as retaliatory.   The Tenth Circuit has held that a pattern of retaliatory conduct can supplement the causal link between protected activity and subsequent adverse employment actions—*i.e.*, relax the close temporal proximity requirement.   *See Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (recognizing that it has held that a pattern of discrimination serves to relax the close temporal proximity necessary to establish pretext) (citation omitted); *Marx v. Schnuck Mkts. Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (holding that the close temporal proximity requirement should not be read too restrictively where a pattern of discrimination begins soon after protected activity and only culminates later in actual discharge).

The evidence indicates that Defendants placed written reprimands in Plaintiff's file for incidents which occurred on June 27, 2011, which was seven days after her complaint of discrimination, [Doc. 41-12], and on July 1, 2011, which was eleven days after her complaint, [*id.* at 21].   Defendants thereafter demoted Plaintiff and reduced her salary by $1.00 per hour to reflect this demotion on July 3, 2011, which was thirteen days after Plaintiff complained of age discrimination.   Defendants then counseled Plaintiff for incidents which occurred on July 5, 2011,

approximately two weeks after her complaint, and on July 26, 2011, five weeks after her complaint.[15]   [*Id.* at 23].   Around July 21, 2011, which was four weeks and 2 days after Plaintiff's complaint, Hyatt Tamaya management began limiting Plaintiff's tables and not seating her with large parties, which in turn decreased Plaintiff's tips.   [*Id.* at 24].   On July 25, 2011, which was four weeks and six days after her complaint, one manager followed Plaintiff around with a pen and paper pad to, on the evidence construed in Plaintiff's favor, "catch" Plaintiff making mistakes.   [*Id.* at 25].   Defendants also counseled Plaintiff for receiving a poor *Maritz* score on July 29, 2011, which was five weeks and four days after her complaint of discrimination. On August 3, 2011, which was six weeks and two days after Plaintiff complained of age discrimination, Defendants suspended Plaintiff with pay for violating the cash handling policy, and on August 5, 2011, which was six weeks and four days after Plaintiff's complaint, Defendants terminated Plaintiff.[16]

The evidence further indicates that Defendants based their decision to terminate Plaintiff

---

[15]   Although Hyatt Tamaya indicated that it ordinarily would have written Plaintiff up for the July 5 and July 26 incidents but that it would not do so to allow the "increasingly anxious situation to calm down," [Doc. 41-12 at 23], management cited these incidents as reasons for Plaintiff's ultimate termination, [*id.* at 27].

[16]   The Court has held that Plaintiff cannot bring an ADEA or NMHRA claim premised upon any adverse employment actions occurring prior to July 21, 2011.   Thus, Plaintiff cannot bring an ADEA or NMHRA claim premised upon Defendants' adverse actions of issuing a written reprimand to her on June 27, 2011, which was seven days after her complaint of age discrimination, issuing a written reprimand to her on July 1, which was eleven days after she complained about age discrimination, or demoting Plaintiff on July 3, 2011, which was thirteen days after she complained about age discrimination.   Although Plaintiff cannot sustain a statutory claim premised upon adverse actions occurring prior to July 21, 2011, the Court specifically has held that these actions can serve as evidence in support of Plaintiff's timely-filed ADEA and NMHRA claims.   Thus, Defendants' actions prior to July 21st can serve as evidence that Defendants engaged in a pattern of retaliatory conduct after Plaintiff complained of age discrimination and this pattern, in turn, can relax the close temporal proximity necessary to establish causation.

71

on her violation of the unacceptable behavior policy specifically related to performance, that they specifically identified the four 2011 guest complaints Plaintiff received on June 27, July 1, July 5, and July 26, and the written Maritz guest complaint on July 29, 2011, as the basis for their conclusion that Plaintiff violated the unacceptable behavior policy, and that they based their decision to terminate Plaintiff on her violation of the cash handling policy on July 30, 2011.   [*Id.* at 27].   That the earlier of these individual actions which formed the basis of Plaintiff's termination occurred seven, eleven, and fifteen days after Plaintiff's complaint serves to strengthen the proximal link between Plaintiff's protected activity on June 20, 2011, and her subsequent termination on August 5, 2011.

In addition to the foregoing evidence which demonstrates a pattern of retaliatory conduct and satisfies the Tenth Circuit's "plus" component of the temporal proximity standard,[17] *cf. Metzler*, 464 F.3d at 1172, Plaintiff also presents other "plus" evidence from which a reasonable trier of fact could infer retaliatory motive.   Of special import is an email from Mardell, one of the managers involved in the decision to terminate Plaintiff, to General Manager Kareti with a copy to Frazier (both of whom also were involved in the decision to terminate Plaintiff), dated July 1, 2011, which was eleven days after Plaintiff's complaint, indicating that "[Plaintiff] has lost the ability to accomplish her job with us," and that "[Plaintiff] of course is going to say we are being unfair and riding her but she is missing the basic fundamentals and in all fairness she brought this added scrutiny on herself" when she complained to the corporate Human Resources Department.[18]

---

[17]   In addition to the evidence identified in this Section, the Court also holds that Plaintiff's evidence of falsity and deviation constitutes "plus" evidence relevant to temporal proximity.   *See supra*, Discussion, III.A.2.b.i, ii.

[18]   The Court, consistent with is obligation to construe the evidence in Plaintiff's favor as the party opposing summary judgment, assumes that Mardell's comment that Plaintiff "brought this added

[Doc. 41-14 at 16].   Also notable is Mueller's e-mail to Frazier, dated July 6, 2011, which was sixteen days after Plaintiff's complaint, in which Mueller stated that "it does seem that continued or further documentation could/would be construed as retaliation."   [Doc. 52-10 at 6].   Also serving as circumstantial evidence that raises an inference of retaliation is that Kareti informed Plaintiff at her July 6, 2011, meeting with Plaintiff that "managers are on edge, as they are trying to be fair and consistent but are walking on egg shells as a result of [Plaintiff] escalating her issues to the general manager, human resources and corporate office," [Doc. 41-12 at 24], and that management, in contravention of its open door policy, discouraged employees from addressing problems with the corporate Human Resources Department and that it was "known around the hotel that you don't want to . . . contact[] corporate, because if you do, then there would be a consequence.   [Doc. 52-3 at 52:13-25].

The Court concludes that the foregoing circumstantial evidence, including Defendants' pattern of retaliatory conduct after Plaintiff's complaint of age discrimination, combined with the close temporal proximity between Plaintiff's complaint and Defendants' adverse employment actions occurring on or after July 21, 2011, is sufficient evidence to allow a trier of fact reasonably to infer that Defendants possessed a retaliatory motive when they disciplined, suspended, and/or terminated Plaintiff in close temporal proximity to Plaintiff's June 20, 2011, complaint of age discrimination.   The Court is not persuaded to hold otherwise by Defendants' argument that discipline Plaintiff received prior to her June 20, 2011, complaint of age discrimination undercuts any inference of causation.

Defendants argue that Plaintiff's "performance counselings" which "occurred before

---

scrutiny on herself" meant that Plaintiff drew attention to herself by complaining to the corporate Human Resources Department.

[Plaintiff's] purported complaints"—*i.e.*, her written reprimand on April 7, 2011, and management's expression of frustration with Plaintiff and her fellow servers for their failure to provide timely service on June 16, 2011—demonstrate that "[Plaintiff] was disciplined for [incidents predating her complaint] in the same way she was disciplined for similar instances after her alleged complaint."   [Doc. 41 at 24].   Thus, according to Defendants, because they "treated [Plaintiff's] customer complaints with the same gravity both before and after her alleged complaint," "[t]here is no evidence of pretext of retaliation."   [*Id.*].

Admittedly, "[e]vidence that the employer [was] concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002); *see, e.g.*, *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1203 (10th Cir. 2005) (rejecting the plaintiff's argument that his termination, which occurred shortly after he filed an internal grievance, was retaliatory, because the employee had a history of disciplinary issues that predated his complaint and failed to follow his employer's directives in the days between his grievance and his termination).   Here, however, the evidence construed in Plaintiff's favor indicates that the prior incidents are unrelated to Defendants' stated reason for their employment decisions, and therefore the Court concludes that the incidents do not undercut causation.

On April 7, 2011, Hyatt Tamaya's management issued a written reprimand to Plaintiff because a guest, Dr. Clatanoff, approached management to request that Plaintiff and/or all Santa Ana Café servers learn more about gluten-free options and celiac disease.  Although Clatanoff states in his declaration that he does "not recall ever complaining about Sharon Jones," [Doc. 52-5 at 2], Plaintiff testified that the manager on duty that night informed her that Clatanoff reported Plaintiff's service was "fine" but that he wished Plaintiff in particular had explained the

74

gluten-free options on the menu in more detail, [Doc. 41-1 at 80:8-82:1].  In his declaration, Clatanoff asserts that Plaintiff "did a nice job overall" and that "[s]he was friendly, warm and competent."   [Doc. 52-5 at 4, ¶ 3].

Although the incident involving Clatanoff occurred two and one-half months prior to Plaintiff's June 20, 2011, complaint, the Court does not believe that this incident negates an inference of pretext arising from temporal proximity.   The pre-complaint incident involving Clatanoff involves a disciplinary issue distinct from those at issue in the post-complaint incidents. The latter complaints on June 27, July 1, July 5, and July 26, 2011, as well as the written Maritz survey on July 29, 2011, and the cash handling violation on July 30, 2011, upon which Defendants premised their termination of Plaintiff, involved Plaintiff's failures to ring in menu items and promptly to inform management of service problems and her cash handling violation, and not Plaintiff's failure to be familiar with the compatibility of menu items with gluten-free or other dietary restrictions.   Moreover, the evidence construed in Plaintiff's favor does not indicate that Clatanoff complained about Plaintiff in particular but rather that he requested that all Santa Ana servers learn about gluten-free options and celiac disease.   [Doc. 52-5 at 2].   Because the subject matter of the alleged complaint is distinct from the performance problems that form the basis of Defendants' stated reason for Plaintiff's discharge, and because the evidence construed in Plaintiff's favor does not establish that Clatanoff complained about Plaintiff's service in particular, the Court concludes that the April 7, 2011, incident does not undercut causation or negate an inference of pretext.

Likewise, the June 16, 2011, incident between Plaintiff and assistant manager Philippsen does not undercut the probative value of temporal proximity because the incident is not indicative of a specific and continuing disciplinary problem of Plaintiff's.   Defendants characterize the June

75

16, 2011, incident as one for which Plaintiff received a "performance counseling," but Defendants' own evidence does not support this characterization.   Frazier's July 6, 2011, memorandum summarizing the incident confirms that Philippsen did not complain about Plaintiff's failure to ring in an order or her failure to inform management of a forgotten order. Indeed, the evidence does not establish that Philippsen or another manager issued any written reprimand or other discipline to Plaintiff arising out of her conduct on June 16, 2011.   Rather, the evidence suggests that it was Plaintiff who was frustrated with Philippsen on that evening.

Frazier's memorandum reports that the June 16, 2011, incident arose because Plaintiff "felt [Philippsen] was rude in expressing his frustration with her and other servicers on the P.M. shift on the evening in question."   [Doc. 41-12 at 16].   While Frazier's memorandum establishes that Philippsen also was frustrated, the memorandum clearly states that Philippsen's frustration was not with Plaintiff in particular but with all Santa Ana servers in general.   Specifically, the memorandum reports that Philippsen was "frustrate[ed] with all servers in general in that they were unable to be attentive to guests in a timely manner.   The servers had 2 or 3 tables each and yet new tables were not greeted timely, etc.   He felt they should not have been overloaded and just felt the servers were not being attentive to tasks at hand."   [*Id.*].   Philippsen further believed "servers [were] not meeting expectations in general and [the restaurant's] Maritz scores [were] reflecting [that] the service levels [were] not being maintained at an acceptable level."   [*Id.*]. Apparently, when Philippsen expressed this general frustration to Plaintiff, Plaintiff "bec[ame] emotional on the 'floor' with guests nearby," and Philippsen "tried to console her and in so doing, touched her"—or as Plaintiff's evidence suggests, "grabbed her arm."   [*Id.*].   Frazier's memorandum further establishes that at the end of the evening, Plaintiff explained to Philippsen, as did another server, that the restaurant was not staffed properly and that this was the reason for

the server performance issues that evening.   [*Id.*].

Construing the evidence in Plaintiff's favor, the Court concludes that the incident on June 16, 2011, does not undercut an inference of pretext based upon temporal proximity.   Evidence establishing that management was frustrated with all servers on one occasion does not establish that management had a specific and continuing disciplinary concern involving Plaintiff that predated Plaintiff's complaint of age discrimination, particularly when Philippsen did not issue any formal disciplinary action against Plaintiff, and Defendants did not rely upon the incident to support their decision to terminate Plaintiff.   Thus, the Court declines to discount Plaintiff's evidence of temporal proximity because of these two prior incidents.

iv.   <u>Prior Treatment</u>.

To establish pretext, Plaintiff also relies upon evidence of a discrepancy between Defendants' treatment of Plaintiff prior to and after she engaged in statutorily-protected activity. The Tenth Circuit has held that "'evidence of pretext may include [evidence of an employer's] prior treatment of plaintiff."   *Metzler*, 464 F.3d at 1174; *see also Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984) (same), *cert. denied*, 469 U.S. 855 (1984); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (same); *Juneau v. Intel Corp.*, 127 P.3d 548, 555 (N.M. 2005) (same).   If the Court determines that Plaintiff has pointed to evidence demonstrating that Defendants' assessments of her performance "after [her complaint] differed materially in an unexplained way from [their] evaluations before that date," *Metzler*, 464 F.3d at 1174, this evidence could raise an inference of a retaliatory motive based upon the differences in treatment.

Plaintiff's prior treatment evidence demonstrates that she worked at The Santa Ana Café for "ten years . . . with almost no discipline whatsoever, when it is not unusual for servers to receive ten or twenty 'write-ups' in lesser time," and that after she reported discrimination, "Hyatt

77

alleges that [Plaintiff's] performance went from one of the best servers on staff to the worst."

[Doc. 52 at 23-24].   Plaintiff's evidence also establishes that in January 2011, six months prior to

her complaint to the corporate Human Resources Department, Plaintiff received an annual

evaluation rating her as "meets standard, " in which Beesley stated,

> Sharon is a warm and genuine person.   She makes every effort to
> make sure her guests are taken care of in every way.   She has
> complete knowledge of the menu and of the service standards and is
> an informal leader of the team.   Sharon is always positive and
> support of her team mates (sic) and is always there to lend [an] ear
> and a kind word or a word of wisdom.   Sharon has many regular
> customers who request her as their server.   She has an amazing
> work ethic which never falters.

[Doc. 52-6 at 7].   Moreover, in an e-mail to Mueller regarding the July 1, 2011, complaint from

the fourteen-person table, Frazier acknowledges that the hotel has "not had these kinds of issues

with Sharon in the past."   [Doc. 41-14 at 20].

Plaintiff's evidence, construed in her favor, also establishes that after her June 20, 2011,

complaint to corporate headquarters, Defendants' assessment of Plaintiff's performance, and their

treatment of Plaintiff, materially differed.   The Court already has described the pattern of

retaliatory conduct established by the facts construed in Plaintiff's favor.   *See supra*, Discussion,

§ III.A.2.b.iii.   In sum, Plaintiff received counseling and/or reprimands for four guest complaints

involving her failure to ring in orders accurately, one counseling and/or reprimand for a poor

*Maritz* survey, one suspension for a cash-handling violation, and termination based upon the

foregoing incidents.   The evidence also demonstrates that Defendants' treatment of Plaintiff

changed in a material way when they began subjecting her to heightened scrutiny.   One manager

even began following Plaintiff around with a pen and paper to document her poor performance.

[Doc. 41-12 at 25].   In addition, an e-mail from Mardell charges Plaintiff with "br[inging] this

added scrutiny on herself" when she contacted corporate headquarters.   [Doc. 41-14 at 16].   Even Mueller from corporate headquarters acknowledged that further scrutiny of Plaintiff's performance issues "could/would" be construed as retaliation.   [Doc. 52-10 at 6].

The Court already has held that Plaintiff's evidence of falsity, deviation, and temporal proximity "plus" is sufficient to create a factual dispute, and this holding is dispositive.   The discrepancies in treatment before and after Plaintiff's protected activity simply constitute further evidence from which a reasonable trier of fact could conclude that Defendants' stated reason for their adverse employment actions was a pretext for retaliation.

v.     <u>Plaintiff's Evidence Creates A Factual Dispute Whether Defendants' Stated Reason for their Adverse Employment Actions was Pretextual</u>.

The Court concludes that Plaintiff's evidence creates a factual dispute whether Defendants' stated reason—*i.e.*, performance problems—for disciplining and/or suspending, as well as for terminating, Plaintiff was a pretext for retaliation.   Thus, having held that Plaintiff has satisfied her initial burden under the *McDonnell Douglas* framework of establishing a prima facie case of retaliation and her subsequent burden under *McDonnell Douglas* of pointing to evidence which creates a factual dispute whether Defendants' stated reason for their adverse employment actions was a pretext for retaliation, the Court denies Defendants' First Motion for Summary Judgment on Plaintiff's ADEA and NMHRA retaliation claims.

3.     <u>Factual Disputes Preclude Summary Judgment on Plaintiff's ADEA and NMHRA Discrimination Claims</u>.

Defendants next argue that they are entitled to summary judgment in their favor on Plaintiff's ADEA and NMHRA claims for discriminatory suspension and discharge because Plaintiff has not satisfied her evidentiary burden under the *McDonnell Douglas* framework of

79

coming forward with evidence indicating that their proffered reason for their adverse employment actions—*i.e.*, plaintiff's poor job performance—was a pretext for discrimination. Plaintiff contends that summary judgment is improper because she has pointed to direct evidence of age discrimination and also because her indirect evidence of age discrimination satisfies her evidentiary burdens under the *McDonnell Douglas* burden-shifting framework.

The Court declines to grant Defendants summary judgment on Plaintiff's age discrimination claims. Although the Court concludes that Plaintiff has not pointed to direct evidence of age discrimination, the Court holds that Plaintiff has identified circumstantial evidence of discrimination sufficient to create a genuine dispute whether Defendants' stated reason for their employment actions was a pretext for discrimination. Accordingly, the Court denies Defendants' request for summary judgment on Plaintiff's ADEA and NMHRA age discrimination claims.

a. <u>Plaintiff Does Not Present Direct Evidence of Discrimination</u>.

Direct evidence of discrimination is evidence from which the trier of fact may conclude, without inference, that the employment action was undertaken because of the employee's protected status. *See Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (citation omitted), *cert. denied*, 130 S. Ct. 69 (2009); *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007). According to Plaintiff, direct evidence of discrimination includes "numerous statements by Hyatt management that [Plaintiff] was too old for promotion to the Corn Maiden and too old to be working at Hyatt." [Doc. 52 at 23]. Plaintiff cites fellow server Raymond Russo's testimony that Beesley told him that higher management would not promote Plaintiff because of her age, and former assistant manager Thomas's assertion that Beesley told her Hyatt Tamaya would not promote Plaintiff because of her age. [*Id.*].

80

While this evidence may constitute direct evidence that Defendants failed to promote Plaintiff in 2010 because of her age, *see Sanders*, 544 F.3d at 1105, it does not constitute direct evidence that Defendants reprimanded, suspended, or terminated Plaintiff in 2011 because of her age.   Plaintiff has indicated that she is not pursuing an ADEA or NMHRA claim premised on Defendants' failure to promote her.   Thus, that Plaintiff has direct evidence of a failure to promote because of her age is of no consequence.   Moreover, the failure to promote claims are not viable because the Court has granted Defendants' Motion to Dismiss all ADEA and NMHRA claims premised upon adverse employment actions occurring prior to July 21, 2011, on the ground that these claims are time barred.   *See supra*, Discussion, § I.C.   Thus, the only ADEA and NMHRA claims before the Court are premised upon Defendants' employment actions of disciplining, suspending, and/or terminating Plaintiff on or after July 21, 2011.   Plaintiff's evidence that Defendants failed to promote her in 2010 because of her age does not constitute direct evidence that they made these adverse employment decisions in 2011 because of her age.

Plaintiff also argues that Thomas's declaration that Mardell told her he disliked Plaintiff because of her age, Gray's and Thomas's declarations that Mardell, Beesley, and Frazier would frequently ridicule Plaintiff because of her age, and Plaintiff's testimony that "[o]ther individuals at Hyatt made comments about [her] age without repercussion, including teasing [her] that she was elderly and infirm," constitutes direct evidence of discrimination.   [Doc. 52 at 23].   Evidence that management and other Hyatt employees ridiculed Plaintiff because of her age, however, does not directly establish *without inference* that management made its adverse employment decisions because of Plaintiff's age.   *Cf. Sanders*, 544 F.3d at 1105 (direct evidence is evidence from which one can conclude without inference that the employment action was undertaken because of the employee's protected status).   Thus, the facts identified by Plaintiff do not constitute direct

evidence of discrimination.

Finally, Plaintiff maintains that Gray's and Thomas's declarations contain direct evidence that Mardell and Beesley targeted Plaintiff for discipline because of her age.   [Doc. 52 at 23]. While evidence that management targeted Plaintiff because of her age would constitute direct evidence of discrimination, the declarations Plaintiff cites do not contain such assertions.   Rather, Gray declares only that Mardell and Beesley asked Gray how he felt about Plaintiff and her performance and that Gray believed Mardell and Beesley were singling Plaintiff out for discipline because they did not ask him about other servers and because they only criticized Plaintiff.   [Doc. 52-5 at 9].   Thomas declares that Mardell instructed Thomas to watch Plaintiff because of her age and because she could "be stealing from the Hyatt."   [*Id.* at 7].   These assertions do not constitute direct evidence from which the trier of fact could conclude without inference that Mardell or Beesley disciplined and/or terminated Plaintiff because of her age.   Because Plaintiff identifies no direct evidence related to her 2011 claims, the Court considers only whether Plaintiff's indirect evidence of discrimination is sufficient to withstand summary judgment.

> b.   Plaintiff's Indirect Evidence of Discrimination is Sufficient to Withstand Summary Judgment.

Plaintiff utilizes the *McDonnell Douglas* burden-shifting framework to substantiate her ADEA and NMHRA age discrimination claims.   Under the *McDonnell Douglas* framework, Plaintiff first must establish a prima facie case of discrimination by showing (1) she was 40 years or older; (2) she performed satisfactory work and was otherwise qualified; (3) she was terminated or otherwise suffered an adverse employment action; and (4) she was replaced by a younger employee.   *See Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010); *see also Cates v. Regents of N.M. Inst. of Min. & Tech.*, 954 P.2d 65, 70 (N.M. 1988).   Next, the burden of

production shifts to Defendants to show a "legitimate, nondiscriminatory reason" for the adverse employment action or actions. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Cates*, 954 P.2d at 70. Once satisfied, Plaintiff must then produce evidence that Defendants' reason was pretextual. *See Wilkerson*, 606 F.3d at 1266; *Cates*, 954 P.2d at 70.

Defendants argue that the Court should grant summary judgment on Plaintiff's ADEA and NMHRA discrimination claims because they have articulated a legitimate, non-discriminatory reason to discipline and terminate Plaintiff because Plaintiff has failed to demonstrate that this reason was a pretext for discrimination. The Court already has held, in the context of evaluating Defendants' motion for summary judgment on Plaintiff's retaliation claims, that Defendants' stated reason for their adverse employment actions satisfies their burden of production under *McDonnell Douglas* of articulating a legitimate, non-discriminatory reason for their employment decisions. This holding is equally applicable to Defendants' motion for summary judgment on Plaintiff's ADEA and NMHRA discrimination claims.

Having held that Defendants have satisfied this burden, the Court next must determine whether Plaintiff has satisfied her final burden under *McDonnell Douglas* by identifying evidence which raises a factual dispute whether Defendants' stated reason for their employment decisions was a pretext for discrimination. The Court answers this question in the affirmative and therefore denies Defendants' motion for summary judgment on Plaintiff's ADEA and NMHRA discrimination claims.

The Court has held, in the context of denying Defendants' motion for summary judgment on Plaintiff's retaliation claims, that Plaintiff's evidence of falsity and deviation are sufficient to create a factual question whether Defendants' stated reason for disciplining, suspending, and/or terminating her was a pretext for retaliation. For the same reasons, the Court similarly holds that

this evidence is sufficient to create a factual question whether Defendants' stated reason for their employment actions was a pretext for discrimination.   The Court therefore denies Defendants' motion for judgment as a matter of law on Plaintiff's ADEA and NMHRA age discrimination claims.   Because this decision is dispositive, the Court need not consider whether Plaintiff's age-related evidence of pretext creates a factual question sufficient to defeat summary judgment.[19]

B.   Defendants are Entitled to Summary Judgment on Plaintiff's Defamation Claims Premised Upon the Removal of Plaintiff's Duties as Designated Trainer.

Defendants move for summary judgment on Plaintiff's defamation claims, which they interpret as premised upon the removal of Plaintiff's duties as The Santa Ana Café's designated trainer.   Defendants base this interpretation on Plaintiff's deposition answer of "Yes," to defense counsel's question, "'So I understand what you're [alleging was] defamatory was taking your trainer responsibility away.'"   [Doc. 41 at 26 (quoting Jones Dep. 194:3-25)].

The defamation claims alleged in the First Amended Complaint, however, are broader than Defendants' interpretation.   Plaintiff alleges that "Defendants Mardell, Beesley and Frazier published communications containing statements of fact about the Plaintiff, including about her

---

[19]   To create an inference of discrimination, Plaintiff points to statements from Mardell and Beesley in which they made derogatory jokes about Plaintiff's age and/or indicated that they would not promote Plaintiff because of her age.   [Doc. 52-11 at 2].   Defendants contend that this evidence fails as a matter of law to create an inference of pretext because of the lack of temporal proximity between the remarks and the adverse actions, [Doc. 41 at 22 (citing *Wagoner v. Pfizer*, No. 09-3066, 2010 U.S. App. LEXIS 16867, *16-17 (10th Cir. Aug. 12, 2010) (comments made by a non-decisionmaker that are nine months removed from the adverse action do not defeat pretext)); Doc. 59 at 8], and because remarks concerning the 2010 job opening are irrelevant to the pending 2011 claims, [Doc. 41 at 22 (citing *Sunderman v. Westar Energy, Inc.*, No. 08-3059, 2009 U.S. App. LEXIS 620, *14-15 (10th Cir. Jan. 14, 2009) (holding that "the fact that plaintiff was suspended . . . by his then-supervisor . . . allegedly for complaining about retaliation for making his complaint . . . in March 2002, is . . . insufficient to raise an inference of retaliation with regard to the separate decision of [another supervisor]"); Doc. 59 at 7 (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions."))].

ability to perform her job duties, the quality of her work, her commitment to her employment, her adherence to the rules of her employment, and other matters relating to her employment." [Doc. 21 at 9, ¶ 59]. Likewise, in her opposition to summary judgment, Plaintiff argues that Defendants defamed her by making statements that she was "senile," that she was "not appealing as a service provider," and that she was "possibly stealing" from Hyatt Tamaya. [Doc. 52 at 29]. Defendants object to Plaintiff's inclusion of these statements in her defamation claims on the ground that Plaintiff failed to provide them with sufficient notice of these claims.

In New Mexico, a plaintiff alleging defamation must set forth the specific defamatory statements in the complaint. *See Weise v. Washington Tru Solutions, L.L.C.*, 192 P.3d 1244, 1252-53 (N.M. Ct. App. 2008). Because the First Amended Complaint does not set forth any specific defamatory statements, and alleges only generally that Defendants made defamatory statements about her competence as a server and her compliance with Hyatt Tamaya's policies and procedures, the Court concludes that any defamation claims premised upon statements that Plaintiff is "senile" and might be "stealing" are not before the Court. Accordingly, any motion for summary judgment on those claims is not ripe, and the Court, therefore, denies the First Motion for Summary Judgment to the extent it seeks summary judgment on these claims.

The Court, however, grants the First Motion for Summary Judgment to the extent Plaintiff pleads, and Defendants seek summary judgment on, any defamation claims premised upon the removal of Plaintiff's duties as the designated trainer. In New Mexico, to state a claim for relief, Plaintiff must allege plausible facts establishing the following elements: "a defamatory communication published by the defendant, to a third person, of an asserted fact, of and concerning the plaintiff, and proximately causing actual injury to the plaintiff." *Clough v. Adventist Health Sys., Inc.*, 780 P.2d 627, 632 (N.M. 1989). Defendants argue that they are

85

entitled to summary judgment because (1) the removal of Plaintiff's trainer duties does not constitute a "statement," (2) the evidence does not establish that Defendants "published" the removal of Plaintiff's duties as designated trainer "to a third person," (3) the evidence does not demonstrate that Plaintiff suffered any actual injury—*i.e.*, damage to her reputation—as a result of the publication, and (4) the evidence does not indicate that their intra-corporate qualified privilege is inapplicable.   Because the Court agrees with Defendants' first argument, the Court grants summary judgment in Defendants' favor without considering their remaining arguments.

Defendants contend that the removal of Plaintiff's duties as designated trainer "is not any kind of 'statement' about Jones; rather it is a personnel decision" that "in itself says nothing about any one person."   [Doc. 41 at 27].   According to Defendants, "A decision to do or not do something is not and never has been treated as 'a statement of fact' that may serve as the basis for defamation claim."   [*Id.*].

To support a defamation claim in New Mexico, a plaintiff must establish the existence of a defamatory communication which contains a statement of fact.   *See* U.J.I. 13-1002, N.M. Rules Ann.   Defendants' removal of Plaintiff's duties as designated trainer does not constitute a statement of fact.   Rather, absent any allegation that the removal was accompanied by a statement of fact, the removal constitutes only an action by Defendants.   Thus, to the extent Plaintiff asserts a defamation claim premised upon the removal of her duties as designated trainer, the Court concludes that this claim fails as a matter of law and grants Defendants' motion for judgment in their favor on any defamation claims arising out of the removal of Plaintiff's duties.

C.   <u>Defendants' First Motion for Summary Judgment on Plaintiff's Breach of Contract Claims is Moot</u>.

The Court already has granted Defendants' Motion to Dismiss Plaintiff's breach of

contract claims.   Thus, the Court holds that Defendants' motion seeking summary judgment on the claims is moot and therefore denies the motion as moot.

> D.    The Individual Defendants are Entitled to Summary Judgment on Plaintiff's ADEA Claims.

Defendants ask the Court to grant summary judgment on Plaintiff's ADEA claims against Beesley, Frazier, and Mardell, on the ground that individual supervisors are not liable under the ADEA.   Plaintiff presents no argument to refute Defendants' contention.   The Tenth Circuit repeatedly has held, consistent with the majority position, that supervisors do not fall within the ADEA's definition of "employer" and therefore are not liable under the Act.   *See Butler v. City of Prairie Village*, 172 F.3d 736, 743 (10th Cir. 1991) (recognizing that Title VII, the Americans with Disabilities Act of 1990, and the ADEA all prohibit employer discrimination and do not authorize personal capacity suits against individuals who do not otherwise qualify as employers under the statutory definitions) (internal quotation marks and citations omitted); *Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996) (holding that the court would, consistent with the "majority view," "continue to adhere to this [its] established . . . rule that personal capacity suits against individual supervisors are inappropriate under Title VII"); *Bates v. N.M. Corr. Dep't*, No. 08-CV-1013 JB/RLP, 2010 U.S. Dist. LEXIS 113021, *25 (D.N.M. Sept. 7, 2010) ("Similarly, individual employees are not liable under the ADEA.").   Therefore, the Court concludes that, based upon this precedent, Plaintiff's ADEA claims against the individual defendants do not fall within the ADEA's definition of "employer."   The Court therefore grants Defendants' First Motion for Summary Judgment to the extent it seeks dismissal of Plaintiff's federal ADEA claims against the individual defendants.[20]

---

[20]   In the Court's original order granting in part and denying in part the First Motion for Summary

IV.     Second Motion for Summary Judgment [Doc. 74].

In its April 25, 2014, order granting in part and denying in part the motions before it, the Court explained that it would "construe Plaintiff's response to the Motion for Summary Judgment as a motion to amend the Complaint to add defamation claims premised upon statements that Plaintiff is 'senile.'" [Doc. 65].   The Court granted Plaintiff leave to file a formal and properly-supported motion to amend the complaint, [*id.*], and Plaintiff thereafter filed a Stipulated Motion to Amend Complaint [Doc. 67], which the Court granted on May 15, 2014, [Doc. 68]. On May 16, 2014, Plaintiff filed her Second Amended Complaint containing newly-pled defamation claims against Defendants Mardell and Beesley.   [Doc. 70].

In the Second Amended Complaint, Plaintiff alleges that "[b]eginning in 2010 and most recently in June and/or July 2011, Defendant Mardell published communications containing the statement of fact that 'Sharon Jones is senile" to individuals that were unrelated to employment decision at the Hyatt, including to the line cook, Donald Gray and assistant restaurant manager, Casey Thomas."   [*Id.* ¶ 60].   Plaintiff further alleges that, in 2011, "Defendant Beesley published communications containing the statement of fact that 'Sharon Jones is senile' to individuals that were unrelated to employment decisions at the Hyatt, including the assistant restaurant manager, Casey Thomas."   [*Id.* ¶ 61].

In their Second Motion for Summary Judgment, Defendants seek dismissal of the defamation claims pled in the Second Amended Complaint on the ground that Plaintiff cannot

Judgment, the Court erroneously stated that it "grants Defendants' Motion . . . on the claims against the individual defendants.  [Doc. 65].  The Court hereby amends that order and holds only that Defendants' motion seeking judgment in favor of Defendants' Beesley, Frazier, and Mardell is granted to the extent Plaintiff brings ADEA—and not any other—claims against these defendants.

prove the required elements of defamation.   In New Mexico, a plaintiff bringing a defamation claim must establish that (1) the defendant published the communication; (2) the communication contains a statement of fact; (3) the communication was concerning the plaintiff; (4) the statement of fact was false; (5) the communication was defamatory; (6) the person receiving the communication understood it to be defamatory; (7) the defendant knew that the communication was false or negligently failed to recognize that the communication was false or acted with malice; (8) the communication caused actual injury to the plaintiff's reputation; and (9) the defendant abused its privilege to publish the communication.   *See* U.J.I. 13-1002(B), N.M. Rules Ann. Defendants first argue that Plaintiff's claims fail as a matter of law because she cannot prove when the statements were made, where they were made, to whom they were made, and in what context they were made.   Defendants next contend that the statements Plaintiff identifies are protected expressions of opinion.   Defendants last maintain that Plaintiff cannot show that she suffered actual damages.   [Doc. 74 at 6].   Because the Court holds that the statements identified by Plaintiff are non-actionable expressions of opinion, and grants summary judgment in favor of Defendants Mardell and Beesley on this dispositive ground, the Court declines to consider Defendants' remaining arguments.

The New Mexico Supreme Court in *Marchiondo v. Brown* endorsed the following as "[a] good statement setting forth guidelines to be followed by trial courts in an initial determination of whether a publication constitutes opinion or fact":   "'[T]he crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact.'"   649 P.2d 462, 472 (N.M. 1990) (quoting *Mashburn v. Collin*, 355 So. 2d 879, 885 (La. 1977)).   "What constitutes a statement of opinion as

distinguished from a statement of fact must be determined in each case." *Id*. at 469.  "In resolving the distinction, the following should be considered:   (1) the entirety of the publication; (2) the extent that the truth or falsity may be determined without resort to speculation; and (3) whether reasonably prudent persons reading the publication would consider the statement as an expression of opinion or a statement of fact."   *Id.*   "'[W]here the statements [at issue] are unambiguously fact or opinion, . . . the court determines as a matter of law whether the statements are fact or opinion," but "where the alleged defamatory remarks could be determined either as fact or opinion, and the court cannot say as a matter of law that the statements were not understood as fact, there is a triable issue of fact for the jury.'"   *Id.* (quoting *Bindrim v. Mitchell*, 155 Cal. Rptr. 29, 39, *cert. denied*, 444 U.S. 984 (1979)).

Under New Mexico law, the question for the Court is whether a reasonable person hearing Beesley's and Mardell's statements that "Plaintiff is senile" would be likely to have understood the statements as ones of opinion.  *Cf. id.* at 472.  In making this determination, the Court must consider the entirety of the publication and the extent to which the truth or falsity of the statement can be determined.  *Cf. id.* at 469.

Webster's dictionary defines "senile" as "showing a loss of mental ability (such as memory) in old age."   (http://www.merriamwebster.com/dictionary/senile).   Under this definition, the statement that "Plaintiff is senile" could convey the factual information that Plaintiff is showing a loss of mental ability at her age of 71 years.   On the other hand, the statement that "Plaintiff is senile" could also be construed as a derogatory comment, which, under the circumstances, could not reasonably be interpreted as conveying factual information.

The parties cite no cases addressing the question whether "senile" constitutes an opinion or fact.   The Court has located two cases addressing the issue.   In *Nolan v. Bloomington*

90

*Chrysler-Plymouth Inc.*, the Minnesota Court of Appeals considered whether an employer's statements calling an employee "senile" and addressing him as "Senility," while in the presence of other employees, were actionable statements of fact or opinions upon which the plaintiff could not recover.  No. C4-90-2075, 1991 Minn. App. LEXIS 335, *6-7 (Minn. Ct. App. Apr. 1, 1991). The court held that the statements were opinions.  *See id.*  The court explained that "neither 'senile' [n]or 'senility' appear to be specific or verifiable."  *Id.* at *6.  The court observed that "'[s]enile' or 'senility' can be a medical diagnosis or a derogatory comment," that it could not determine whether the expressions were true or false, that "[t]he comments were made amid an atmosphere of practical jokes and teasing," and that "[u]nder those circumstances, a listener would not be led to believe that the comments were statements of fact."  *Id.* at *6-7.

In *Paige v. Youngstown Board of Education*, the Ohio Court of Appeals considered whether a supervisor's statement that the plaintiff was a "senile, old bitch," uttered in front of the plaintiff's co-workers, constituted actionable defamation.  *See* No. 93-CA-212, 1994 Ohio App. LEXIS 5942, at *2, 10 (Ohio Ct. App. Dec. 23, 1994).  The court answered the question in the negative, because it concluded that the statement was a protected opinion.  *See id.* at *10.  The court explained, "The language used here, 'senile, old bitch' would not likely be used in any setting to convey factual information."  *Id.*  The court further explained that "[s]ocial conventions will often signal to the listener the likelihood of a statement's being either fact or opinion," and reasoned that, under convention, "[p]eople frequently use adjectives such as 'stupid' and 'crazy' to express their feelings or opinion about an individual."  *Id.*  The court then concluded that "[n]o reasonable listener would interpret such expressions as factual assertions about the individual's mental capacity."  *Id.* (citation omitted).  The court cited a prior opinion in which it held that a "[r]adio talk show host's description of sports figure using terms such as

91

stupid, scum, pathological liar, crazy, and suicidal were all considered expressions of opinion, not statements of fact." *Id.* at *11 (citing *Stepien v. Franklin*, 528 N.E.2d 1324 (Ohio Ct. App. 1988)).

Like the courts in *Nolan* and *Paige*, this Court concludes that statements that "Plaintiff is senile" constitute an expression of opinion which are not actionable.  The Court is particularly persuaded by the reasoning of the *Nolan* court, which reasoned that calling an employee "senile" was an opinion because the label "senile" could not be verified.  *See* 1991 Minn. App. LEXIS 335, at *7.  Likewise, so too are the statements that "Plaintiff is senile" by Mardell and Beesley unverifiable, which suggests that the Court should classify the statements as opinions and not actionable statements of fact.

The Court's reliance upon *Nolan*'s reasoning is consistent with New Mexico law.  The New Mexico Supreme Court explained in *Marchiondo* that "extent that the truth or falsity may be determined without resort to speculation" is one of three factors relevant to determining whether a statement should be considered an opinion.  649 P.2d at 472.  Clearly, discerning whether Plaintiff was "showing a loss of mental ability (such as memory) in old age," (http://www.merriamwebster.com/dictionary/senile), requires resort to speculation.  Thus, the first *Marchiondo* factor weighs in favor of construing the statement as an opinion.

The second *Marchiondo* factor, *i.e.*, whether reasonably prudent persons hearing the publication would consider the statement as an expression of opinion or a statement of fact, also weighs in favor of deeming the statement an opinion.  *See id.*  Defendants argue that Gray's declaration makes clear that the context of Mardell's statement "refer[ring] to Plaintiff as 'senile' occurred while 'joking' about her age."  [Doc. 74 at 16].  If Defendants were correct, an atmosphere of joking might suggest the statement was one of opinion.  In *Paige*, the court

explained that "[s]ocial conventions will often signal to the listener the likelihood of a statement's being either fact or opinion."   1994 Ohio App. LEXIS 5942, at *10.   The social convention of making jokes, even unkind and bigoted jokes, likely suggests to a listener that a statement made in the context of joke-making is an opinion.   Contrary to Defendants' assertion, however, Gray does not state in his declaration that Mardell referred to Plaintiff as "senile" *while* he was making jokes about Plaintiff.   [Doc. 74-6 at 9, ¶¶ 9-12].   Rather, Gray asserts only that Mardell made jokes about Plaintiff's age *and* that Mardell called Plaintiff "senile," without specifying when Mardell made jokes about Plaintiff or when he called her "senile."   [*Id.*].   Thus, the Court has no basis for concluding that Mardell's statement occurred in the context of joking about Plaintiff's age.

Even though the Court does not accept Defendants' characterization of the context in which Mardell made the statement as an environment of joking, the Court nonetheless concludes that the context, as it appears on summary judgment, was not one in which a reasonably prudent person would believe that Mardell's or Beesley's references to Plaintiff as "senile" were based in fact.   Gray asserts that Mardell would say, when Gray and Mardell were in the kitchen, that "Sharon is senile," "Sharon is getting up in age," and "Sharon is getting too old," and that Gray heard Mardell call Plaintiff "'senile' to Frazier as well as make other derogatory comments about her age."   [Doc. 74-6 at 9, ¶¶ 10, 12].   Thomas asserts that "Mardell would . . . frequently tell me to watch [Plaintiff] because she was an 'old-timer' and 'senile' and could possibly be stealing from the Hyatt by not charging guests for Brunch buffets because they paid cash."   [Doc. 74-5 at 3, ¶ 6]. Without any accompanying statements suggesting a factual basis to Mardell's and Beesley's label of "senile," the Court concludes that social convention would not suggest to a reasonable person that Mardell or Beesley had a factual basis for calling Plaintiff "senile."

Neither does Plaintiff argue, nor the evidence does not show, that Mardell or Beesley

added other facts to their statements which would suggest that the statements were based in fact.

If, for example, either Mardell or Beesley had stated that "Plaintiff is senile" and then followed the

comment with a second statement that Plaintiff is taking medication for dementia or Alzheimer's

disease, the Court would conclude that a question of fact exists for the jury whether a reasonably

prudent person likely would conclude that the word "senile" conveyed factual information.

Likewise, if Plaintiff had presented evidence that Mardell or Beesley called Plaintiff "senile" after

complaining about her increased pattern of forgetfulness and/or that Defendants implied that

Plaintiff's forgetfulness was related to a medical diagnosis of senility, the Court would conclude

that a dispute of fact exists.   Plaintiff, however, presents no such evidence and makes no such

argument.   Indeed, her sole contention in opposition to summary judgment on the question

whether the statements constituted protected opinions is one paragraph in which she argues

(incorrectly) that Defendants misapprehend the law.[21]   [Doc. 75 at 12].   The Court's role is not to

serve as Plaintiff's advocate or to advance arguments on Plaintiff's behalf.   Thus, in the absence

---

[21]   Although Plaintiff properly contends that "[s]tatements of both fact and opinion are actionable, but statements of opinion must contain the factual bases for the speaker's opinion," she then construes the standard governing actionable opinions as authorizing a defamation claim only where the plaintiff's evidence demonstrates that the speaker has *no* factual basis for his or her opinion.   [Doc. 75 at 12].   To this end, Plaintiff cites *Andrews v. Stallings*, for the incorrect proposition that a "statement of opinion is actionable as defamatory where the speaker *does not* provide the factual basis for its statement."   [*Id.* (citing 892 P.2d 611, 615 (N.M. Ct. App. 1995) (emphasis added)].   The Court of Appeals, however, in *Stallings* held not that an opinion *unsupported* by facts is actionable as defamation but rather only that an opinion *supported* by facts is actionable.   *See* 892 P.2d at 615 (explaining that "'[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable *only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion*'") (quoting *Restatement (Second) of Torts* § 566 (1976)) (citing *Marchiondo*, 649 P.2d 462, 472 (N.M. 1982)) (emphasis added).   Thus, to survive summary judgment on a defamation claim based upon the statement of an opinion, Plaintiff must point to facts demonstrating that Mardell's and Beesley's statements implied the *existence* (and not absence, as Plaintiff argues) of undisclosed defamatory facts.   *See id.*   As the Court has explained, Plaintiff has failed to point to any such implied facts.

of any such evidence or argument, the Court concludes that the second *Marchiondo* factor weighs

in favor of construing Mardell's and Beesley's references to Plaintiff as "senile" opinions.[22]

Admittedly, the context here is distinguishable from that in *Paige*, in which the court held

that the supervisor's statement "senile, old bitch" was an opinion.  *See* 1994 Ohio App. LEXIS

5942, at *10-11.   The *Paige* court reasoned that under social convention, "[p]eople frequently use

adjectives such as 'stupid' and 'crazy' to express their feelings or opinion about an individual,"

and that "[n]o reasonable listener would interpret such expressions as factual assertions about the

individual's mental capacity."   *Id.* at *10 (citation omitted).   Here, Defendants allegedly uttered

statements that Plaintiff was "senile" without accompanying those statements with an additional

derogatory epitaph akin to the "old bitch" uttered in *Paige*.   Nonetheless, the Court holds that, on

balance, because "senile" is not capable of confirmation without resort to speculation, and because

the context in which the comments were made does not imply the existence of undisclosed

additional facts or otherwise suggest that the statements were supported by a factual basis, the

statements constitute protected opinions and not actionable defamation.   Accordingly, the Court

grants Defendants' Second Motion for Summary Judgment and dismisses Plaintiff's defamation

claims against Defendants Mardell and Beesley.

## **CONCLUSION**

For the foregoing reasons, **IT THEREFORE IS ORDERED** that the Motion to Dismiss

[Doc. 22] is **GRANTED IN PART** and **DENIED IN PART** as follows:

---

[22]   The Court notes that the first *Marchiondo* factor, the entirety of the publication, on balance is neutral, because, on the evidence before the Court, it is unclear in what context the statement occurred.   While Defendants contend the statements were made while joking, the evidence does not support this conclusion.   Likewise, nor does the evidence support the conclusion that the statements were made in a context suggesting the existence of a factual basis for the claims. Thus, the Court holds that this factor is not useful in weighing whether the statements constitute protected opinions or actionable facts.

(1)     The Motion to Dismiss is **DENIED** as moot to the extent it seeks dismissal of any sex-based discrimination claim.

(2)     The Motion to Dismiss is **DENIED** as moot to the extent it seeks dismissal of any discrimination claim premised upon a failure to promote.

(3)     The Motion to Dismiss is **GRANTED** to the extent it seeks dismissal of discrimination claims premised upon adverse employment actions occurring prior to July 21, 2011.

(4)     The Motion to Dismiss is **DENIED** as moot to the extent it seeks dismissal of the defamation claims pled in the First Amended Complaint, because the Court has granted the First Motion for Summary Judgment on all defamation claims pled in the First Amended Complaint.

(5)     The Motion to Dismiss is **GRANTED** to the extent it seeks dismissal of the breach of contract claims pled in the First Amended Complaint.

**IT FURTHER IS ORDERED** that Defendants' Objections to Plaintiff's Evidence Opposing Defendants' Motion for Summary Judgment [Doc. 60] are **SUSTAINED IN PART** and **OVERRULED IN PART** as follows:

(1)     Defendants' objection to Debra Kane's statement in paragraph six of her declaration that her husband "mentioned that Sharon's tables seemed to be scattered all over the dining room" is **SUSTAINED**; the Court will not consider that statement as evidence to support Plaintiff's opposition to the First Motion for Summary Judgment.

(2)     Defendants' objection to Casey Thomas's statement in paragraph four of her declaration that "[Plaintiff] had even been complimented on guest Maritz surveys" is **SUSTAINED**; the Court will not consider that statement as evidence to support Plaintiff's opposition to the First Motion for Summary Judgment.

(3)     All of Defendants' remaining objections to Plaintiff's evidence are **OVERRULED**.

**IT ALSO IS ORDERED** that the First Motion for Summary Judgment [Doc. 41] is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)     The First Motion for Summary Judgment is **DENIED** to the extent it seeks dismissal of Plaintiff's discrimination claims under the ADEA and NMHRA.

96

(2)     The First Motion for Summary Judgment is **DENIED** to the extent it seeks dismissal of Plaintiff's retaliation claims under the ADEA and NMHRA.

(4)     The First Motion for Summary Judgment is **GRANTED** to the extent it seeks dismissal of the defamation claims premised upon Defendants' removal of Plaintiff's duties as designate trainer.

(4)     The First Motion for Summary Judgment is **DENIED** as moot to the extent it seeks dismissal of Plaintiff's breach of contract claims.

(5)     The First Motion for Summary Judgment is **GRANTED** to the extent it seeks dismissal of Plaintiff's ADEA claims against the individual defendants.

**IT LAST IS ORDERED** that the Second Motion for Partial Summary Judgment [Doc. 74] is **GRANTED**.

Dated this 12th day of December, 2014.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE